# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

THE MEDICAL PROTECTIVE COMPANY,   )
                                         )
        Plaintiff,            )
                                         )
        vs.                   )          Case No. 4:06CV01639 ERW
                                         )
JAMES E. BUBENIK, D.M.D., et al.,     )
                                         )
        Defendants.       )

## MEMORANDUM AND ORDER

This matter comes before the Court on a Non-Jury Trial to address Plaintiff's declaratory judgment held on May 29, 2008, and Post-Trial Briefs filed by the parties [doc. #169, #171, and #172] as well as the Responses to said Post-Trial Briefs [doc. #174, #175, and #176].

This case arises out of a dispute between a medical malpractice insurer, The Medical Protective Company ("MPC"), and an insured dentist, Dr. James E. Bubenik ("Dr. Bubenik"). MPC sued Dr. Bubenik and James E. Bubenik, D.M.D., P.C. (collectively "Bubenik Defendants"), asking the Court to declare that the Bubenik Defendants breached the insurance contract issued by MPC to Dr. Bubenik, and that MPC is not obligated to provide coverage. The Bubenik Defendants then joined Joseph Clinton Johnston, in his individual capacity and as legal guardian of Mary Johnston (collectively "Johnston Defendants") (Bubenik Defendants and Johnston Defendants are collectively referred to as "Defendants"). At issue in this case is whether an insured's assertion of the Fifth Amendment privilege and subsequent refusal to testify and selective participation in the defense of an action against Dr. Bubenik by the Johnston Defendants

violates the cooperation clause included in the insurance agreement, thereby alleviating the insurer of the legal obligation to provide insurance coverage.  The Court finds that it does.

## I.     FINDINGS OF FACT

Dr. Bubenik is a licensed dentist who practices conscious sedation dentistry.  (Bubenik dep. P.13 L.12-20; P.15 L.12-P.16 L.6).  Conscious sedation dentistry is a way of sedating a patient for a dental procedure in a way that the patient remains conscious throughout.  (Bubenik dep. P.20 L.8-12).  Dr. Bubenik treated Marlon Jaudon at his office on July 13, 2004, who died on that day, and he treated Henry Michael Johnston at his office on January 19, 2005, who died January 23, 2005.  (Trial Tr. Vol.I P.32 L.5-11).  Lawsuits were filed by the Jaudon family and subsequently the Johnston family, and MPC was notified to provide the defense of these actions, under the terms of the medical malpractice insurance policy.  Although the notice to MPC by Dr. Bubenik of the lawsuit brought by the Johnston family ("the *Johnston* case") was filtered through his criminal defense attorney, Scott Rosenblum, and consequently was delayed in getting to MPC, MPC has not made an issue of untimely notice.  Throughout the course of these lawsuits, the insured asserted his Fifth Amendment privilege and refused to offer testimony of any sort.  The first lawsuit brought by the Jaudon family ("the *Jaudon* case") was settled out of court.  MPC did not send a reservation of rights letter to Dr. Bubenik in the *Jaudon* case and was prevented from later contesting coverage.

With respect to the *Johnston* case, however, MPC issued a reservation of rights letter, based on what it believed was a breach by the Bubenik Defendants of the cooperation clause in the insurance contract.  The cooperation clause at issue provides:  "The insured shall at all times

2

fully cooperate with the Company in any claim hereunder and shall attend and assist in the preparation and trial of any such claim." (Pl. Ex. 1).

Antony Stephen Ball from Lake Stevens, Washington, is Vice President of Claims for MPC. (Trial Tr. Vol.I P.20 L.4,14,18-20). MPC is a 108-year old, large professional liability health insurer headquartered in Fort Wayne, Indiana, providing liability insurance policies to healthcare providers, particularly physicians, dentists and hospitals. (Trial Tr. Vol.I P.21 L.14-18). Mr. Ball has been employed with MPC for over five years. (Trial Tr. Vol.I P.21 L.19-21). The only claim with which he has been involved where the insured relied upon the Fifth Amendment was the Bubenik claim. (Trial Tr. Vol.I P.26 L.14-16).

Marlon Jaudon was treated by Dr. Bubenik on July 13, 2004. (Trial Tr. Vol.I P.26 L.17-21). When attorneys for MPC attempted to take Dr. Bubenik's deposition on June 29, 2005, in the *Jaudon* action, he refused to give testimony, asserting his Fifth Amendment privilege. (Trial Tr. Vol.I P.28 L.8-12). Also, on November 2, 2005, in the same case, Dr. Bubenik refused to answer interrogatories, assigning the same reason. (Trial Tr. Vol.I P.29 L.17-20). Mr. Ball concluded "at about this time" that Dr. Bubenik breached the policy because of his refusal to testify, "but [he] [did not] believe it rose to the level of being a coverage issue at that point." (Trial Tr. Vol.I P.28 L.4-7).

Mr. Ball described an insurance policy as a risk transfer mechanism which transfers an insured's potential liability in a claim against him to the insurer. He believes the insurance company expects the same level of cooperation under the policy that the insured would provide to himself. (Trial Tr. Vol.I P.43 L.23-P.44 L.34). Mr. Ball had a conversation with Dr. Bubenik around March 2006, when the *Jaudon* case was coming up for trial. (Trial Tr. Vol.I P.48 L.18-

P.49 L.1).  Mr. Ball raised three points with Dr. Bubenik.  First, he alerted Dr. Bubenik to the policy exclusion for general anesthesia or unconscious sedation performed in a dental office.  Dr. Bubenik told Mr. Ball that he did not perform unconscious sedation or dental procedures under general anesthesia in his office, so the exclusion would not be triggered.  (Trial Tr. Vol.I P.49 L.6-20, P.53 L.6-9).  The second point of inquiry by Mr. Ball was whether the claim could be defended, i.e., whether he had been negligent.  Dr. Bubenik told Mr. Ball that "absolutely he did not believe he was negligent," and that he believed that all claims asserted against him could be defended.  (Trial Tr. Vol.I P.50 L.3-11).  Mr. Ball explained that he was aware that Dr. Bubenik had pled the Fifth Amendment right, but he would like to talk to Dr. Bubenik about how the claims could be defended.  Dr. Bubenik was not willing to discuss those claims with Mr. Ball in view of the assertion of the Fifth Amendment.  Mr. Ball told Dr. Bubenik that if he refused to cooperate, if he refused to testify, under the insurance contract, that might give rise to his insurance coverage being jeopardized.  Mr. Ball explained to Dr. Bubenik that to the extent he was willing to testify, there was still time in the *Jaudon* case for sanctions imposed by the state court judge to be removed.  (Trial Tr. Vol.I P.50 L.11-P.51 L.21).  The third point raised by Mr. Ball was to make sure Dr. Bubenik understood the Company's position with respect to full cooperation under the Policy and the potential ramifications if he chose not to cooperate.  Mr. Ball wanted Dr. Bubenik to understand that there was little risk in him testifying if he was not negligent and did not depart from the standard of care, while there was a very real risk that not testifying would result in the entire claim being uninsured.  (Trial Tr. Vol.I P.53 L.19-P.54 L.9)

After talking to Dr. Bubenik, Mr. Hall called Steve Leonard, one of Dr. Bubenik's attorneys.  Mr. Leonard told Mr. Hall that "under no circumstances, at this point was -- was Dr.

Bubenik going to testify." (Trial Tr. Vol.I P.54 L.10-14, P.55 L.3-6). Mr. Ball instructed MPC's counsel, Susan Robertson, to send a letter to Dr. Bubenik outlining the Company's requirement that he fully cooperate under the Policy, including providing sworn testimony. She complied. (Trial Tr. Vol.I P.56 L.15-25) (Pl. Ex. 7). When this letter was sent, two weeks before the *Jaudon* trial, Mr. Hall did not consider it to be a reservation of rights letter. It was the position of MPC to "continue to try to work with Dr. Bubenik to cooperate and to continue to advise him." (Trial Tr. Vol.I P.57 L.1-12).

In preparing to defend the *Jaudon* case, Dan Wilke, the initial attorney provided for Dr. Bubenik by MPC, was able to hire an expert witness to testify for Dr. Bubenik and had developed information that could be used as a causation defense. (Wilke dep. P.14 L.6-24). The expert's name was Jane Turner, Assistant Pathologist for the City of St. Louis. (Trial Tr. Vol.I P.29 L.8-13). However, on April 17, 2006, the morning of trial, Judge Kintz, state court judge in the *Jaudon* case, ruled that MPC's retained expert, Dr. Turner, could not testify. Dr. Turner was stricken as a witness for Dr. Bubenik by the judge because Dr. Turner, in giving her opinions, would be relying on opinions or impressions of Dr. Bubenik that she had learned from a telephone conversation she had with Dr. Bubenik. The trial judge concluded that because Dr. Bubenik was not willing to testify to those opinions and because the plaintiff's attorney would not be able to cross-examine the doctor about them, Dr. Turner would be disqualified from testifying. (Trial Tr. Vol.I P.29 L.20-P.30 L.1 ) (Wilke dep. P.15 L.3-18). Mr. Ball said the striking of Dr. Turner as an expert witness "was devastating to the case." (Trial Tr. Vol.I P.30 L.10-12 ). Dr. Turner was prepared to testify that

> the cause of death had absolutely nothing to do with any conduct of Dr. Bubenik, had absolutely nothing to do with any malpractice, had everything to do with natural causes, and as an independent, impartial witness, we thought she was most likely to be the most persuasive, compelling witness in the case, and without her and with Dr. Bubenik pleading the Fifth, we had nothing. I mean she was everything to us.

(Trial Tr. Vol.I P.30 L.14-22 ). In the face of the ruling striking Dr. Turner, representatives of

MPC concluded that MPC was substantially prejudiced. (Trial Tr. Vol.I P.70 L.6-17).

Mr. Wilke had earlier advised Mr. Ball that the settlement value of the case was between

$100,000.00 and $150,000.00. The case settled for $575,000.00 on the day of trial. (Trial Tr.

Vol.I P.30 L.23-P.31 L.5). Mr. Ball testified that he directed counsel, that in the *Jaudon* case, the

$575,000.00 should be paid in settlement, with MPC reserving all of its rights under the policy.

He claimed that he documented the file with those instructions to counsel, Bill Louthan, but that

Mr. Louthan failed to include the reservation of rights. (Trial Tr. Vol.I P.70 L.18-23, P.71 L.16-

23). Describing this oversight as a "serious matter" (Trial Tr. Vol. I P.72 L.11-17), Mr. Ball said,

> The file clearly reflects that the settlement was to be entered into with all of the rights of Medical Protective being preserved, but, you know, the -- the coverage defense evolved over time, and as we've already established and as I've already testified to, you know, we had the refusal to answer interrogatories; we had the sanction order that was entered; we had the refusal to testify, but at the same time, we had this independent, impartial expert witness who we felt could win the day for us and certainly was instrumental to being able to procure a reasonable settlement of the case, and so it really wasn't until she was struck from the trial that I felt we had been substantially prejudiced. You know, it was an accumulation of all those events that occurred leading up to and including the striking of Dr. Turner from the trial that I felt led to us being substantially prejudiced, and as I said, at that time, it was my intention and my instruction that a reservation of rights letter be sent.

(Trial Tr. Vol.I P.31 L.13-P.32 L.4 ).

On August 23, 2005, during the pendency of the *Jaudon* suit, the Johnston Defendants

filed suit against Dr. Bubenik. (Trial Tr. Vol.I P.31 L.13-P.32 L.4). On November 21, 2005, Dr.

Bubenik asserted his Fifth Amendment rights in response to Plaintiff's interrogatories in the *Johnston* case and refused to answer the interrogatories. On December 20, 2005, state court Judge Barbara Wallace issued a protective order in the *Johnston* case, similar to the one issued in the *Jaudon* case, ruling that evidence could not be used that was obtained from Dr. Bubenik and he could only assert his Fifth Amendment rights at trial. (Trial Tr. Vol.I P.33 L.7-16; P.104 L.10-P.105 L.11). This order did, however, leave open the possibility that Dr. Bubenik could at some point decide not to assert the Fifth Amendment, as long as it would not prejudice the plaintiff. (Wilke dep. P.33 L.18-P.34 L.15). On March 16, 2006, Dr. Bubenik asserted his Fifth Amendment rights at his deposition. (Trial Tr. Vol.I P.33 L.13-16).

In March 2006, Mr. Ball had the previously discussed conversation with Dr. Bubenik, the only conversation he would have with the doctor. This conversation is confirmed by an e-mail progress note in the claims file identifying that such a discussion took place in March. (Trial Tr. Vol.I P.108 L.4-19; P.114 L.14-16). When Mr. Ball talked to Dr. Bubenik, he told Dr. Bubenik that he wanted him to testify. He was trying to obtain Dr. Bubenik's cooperation. (Trial Tr. Vol.I P.126 L.22-P.127 L.3, P.127 L.20-P.128 L.2). Mr. Ball testified that Dr. Bubenik and his lawyers told him that they were not going to change their position on cooperation and that Dr. Bubenik would not be testifying. (Trial Tr. Vol.I P.139 L.17-P.141 L.5).

In mid-May 2006, a "breakdown in communication" developed, and Dr. Bubenik requested that Dan Wilke be replaced as counsel. MPC retained replacement counsel, Brent Baldwin, to represent Dr. Bubenik. (Trial Tr. Vol.I P.34 L.2-14). Before relinquishing defense of the *Johnston* suit, Mr. Wilke provided MPC with an Attorney Suit Report for the *Johnston* claim which notes, in part,

> The insured invoked his Fifth Amendment rights against self-incrimination. This will jeopardize the defense of this case. The doctor will not be able to testify as to his actions or events during the January 19, 2005, procedures. Moreover, the insured will most likely be called to the stand so that the jury will hear him invoke his right against self-incrimination. This will cause an inference that he was at fault, perhaps even criminally, for the death.

(Trial Tr. Vol.I P.34 L.15-18, P.35L.17-24) (Pl. Ex. 24).

Mr. Ball did not interfere in the attorney-client relationship between Mr. Baldwin and Dr. Bubenik by suggesting Dr. Bubenik should drop his reliance on the Fifth Amendment, believing that was a "coverage issue." However, Mr. Ball believed MPC's ability to defend Dr. Bubenik was absolutely affected by his assertion of the Fifth Amendment. (Trial Tr. Vol.I P.40 L.5-22). Mr. Ball was aware that there was a collateral professional disciplinary proceeding involving Dr. Bubenik before the Missouri Dental Board. He requested copies of documents from that proceeding, because he knew that Dr. Bubenik was offering defenses before the disciplinary board. (Trial Tr. Vol.I P.42 L.1-9). Mr. Baldwin demurred, because of potential coverage issues, and Mr. Ball never received copies of those disciplinary board proceedings. (Trial Tr. Vol.I P.41 L.8-25). Mr. Baldwin would not release documents from that proceeding unless Dr. Bubenik's criminal counsel approved the release. (Trial Tr. Vol.I P.43 L.5-14).

In a letter dated August 24, 2006, Mr. Bill Louthan, MPC's counsel, advised Dr. Bubenik's lawyer, Steve Leonard, that full cooperation in the defense of the *Johnston* claim was required, including providing sworn testimony. Mr. Ball said that this letter was not a reservation of rights letter. (Trial Tr. Vol.I P.58 L.8-23) (Pl. Ex.9). Mr. Ball affirmed that it remained the position of MPC that there was a need to continue to request Dr. Bubenik's cooperation, to ask him to work with MPC and provide sworn testimony as required,

and, quite frankly, under the Missouri law that we had been counseled on, there was a -- a risk that if we issued a reservation of rights, that would be construed as a denial of coverage and would provide for certain other rights that the insured has, as has happened in the *Johnston* case whereby he was able to execute a settlement or an agreement of some sort for settlement and take the case -- fire all the lawyers and take the case out of our hands.

(Trial Tr. Vol.I P.59 L.1-13). Neither Dr. Bubenik nor his counsel responded to the August 24, 2006 letter, and neither stated that they did not believe that a refusal to testify was a breach of the cooperation clause. (Trial Tr. Vol.I P.59 L.14-21).

Bruce Baty, counsel for MPC, wrote a letter dated October 6, 2006, to Steve Leonard, one of Dr. Bubenik's attorneys, requesting that Dr. Bubenik cooperate with MPC under the insurance policy. The letter stated that if he continued to refuse to cooperate and refuse to assist in the matter, then MPC would have to choose between electing to deny coverage or providing a continued defense only under a full reservation of rights. Neither Dr. Bubenik nor his counsel responded to this letter. (Trial Tr. Vol.I P.59 L.22-P.60 L.19) (Pl. Ex.10).

By the time scheduled for mediation in the *Johnston* case on October 12, 2006, Mr. Ball had determined he was going to issue a reservation of rights letter. (Trial Tr. Vol.I P.119 L.18-22). He later testified that he believed the prejudice to MPC occurred over time:

Q. Did you believe that MPC was prejudiced by Dr. Bubenik taking his Fifth Amendment rights from the first time that he did so in November of 2005?

A. As I said, I think, several times, I believe the prejudice occurred over time. I cannot pinpoint a particular date and say, you know, at this point in the case, we were prejudiced or we were irreparably prejudiced. I think, you know, the prejudice evolved from, perhaps, a potential prejudice to a little prejudice to substantial prejudice, and –

Q. And that was as you approached trial?

A. It was, yes.

(Trial Tr. Vol.I P.128 L.3-14).  In his deposition, Mr. Ball testified that he thought that MPC was prejudiced "from the get-go."  When asked to explain what he meant by that, Mr. Ball stated that "prejudice was evolving and accumulating from the time [Dr. Bubenik] first asserted his Fifth Amendment privilege."  (Trial Tr. Vol.I P.130 L.7-15).  He went on to explain that there was an effort that continued to try to get Dr. Bubenik to testify:  "we were doing our very best to avoid the devastating prejudice that would occur if we went to trial or were in a position of trying to settle the case without his cooperation.  I mean that -- so we were continuing to try to help to try to persuade him to testify."  (Trial Tr. Vol.I P.131 L.13-22).  Mr. Ball testified that, despite Dr. Bubenik's refusal to testify all the way up to trial in the *Jaudon* case, he believed Dr. Bubenik would change his mind and testify at the *Johnston* trial.  He believed that this was reasonable, notwithstanding the outcome of the *Jaudon* case.  (Trial Tr. Vol.I P.129 L.4-P.130 L.6).

On October 12, 2006, a letter to Dr. Bubenik from Bruce Baty, MPC's counsel, (Pl. Ex. 11) was hand-delivered to the law office of Dr. Bubenik's attorney.  The letter advised Dr. Bubenik that the rights of the Company were reserved as a result of the continued ongoing refusal to cooperate which was prejudicial to the Company.  The letter was hand delivered to Dr. Bubenik on the morning of the mediation of the *Johnston* case.  (Trial Tr. Vol.I P.60 L.20-P.61 L.5).

Leonard Buckley, licensed attorney in Missouri and counsel hired by Joseph Johnston to represent his and his sister's interests concerning the death of their brother, Henry Michael Johnston, explained what occurred at the mediation.  He testified that near the end of the mediation, the mediator told him that the defendant would pay $500,000.00 and "[w]e told him that $600,000.00 would settle the case."  He did not recall if the mediator or Brent Baldwin came

back first, but "they both indicated that the $500,000.00 wasn't really an offer." (Trial Tr. Vol.II P.115 L.25-P.116 L.13). After the mediation failed, Dr. Bubenik fired counsel hired by MPC to represent Dr. Bubenik, and his personal counsel, without the knowledge or involvement of MPC, entered into a settlement agreement. The declaratory judgment in this Court followed. (Trial Tr. Vol.I P.61 L.6-13).

There was extensive testimony regarding the problems the defense faced in the *Johnston* case. Defendants' Exhibit RR is a letter dated July 5, 2006, from Brent Baldwin, MPC's counsel in the *Johnston* case, to Bill Louthan in which Mr. Baldwin states, "there will be little to no room to argue that the insured is not liable. The primary question in this case will be the damages Plaintiffs can recover. This question involves not only the merits of the case but also an examination of noneconomic caps, damage caps in Missouri." (Trial Tr. Vol.I P.76 L.16-25, P.77 L.8-14). On page 132 of Exhibit RR, Mr. Baldwin stated "[w]e also believe that if this case goes to a jury, it is likely that Plaintiffs will recover the full amount of the economic damages claimed, the maximum noneconomic damages available, whether one or two caps, and significant punitive damages." (Trial Tr. Vol.I P.78 L.17-22). Mr. Ball said he had no reason to believe that Mr. Louthan and MPC were not aware of that advice on or about July 5, 2006. (Trial Tr. Vol.I P.78 L.2-8).

In Exhibit RR, Mr. Baldwin outlines three problem areas in the case; the first two were the Fifth Amendment issue and the *Jaudon* case. (Trial Tr. Vol.I P.79 L.4-10). The third problem area Mr. Baldwin identified was "the actions of the insured." (Trial Tr. Vol.I P.81 L.8-13). Mr. Baldwin concluded on page 135, "[w]e believe there is a zero percent chance of a defense verdict." He added, "[w]e recommend attempting to settle this case directly with Plaintiffs'

11

counsel." (Trial Tr. Vol.I P.82 L5-7, L.11-14). In Defendants' Exhibit E, Mr. Baldwin, in discussing potential expert testimony, stated that getting an expert witness for the defense would be an "extreme long-shot." (Trial Tr. Vol.I P.84 L.12-P.85 L.4).

On October 4, 2006, Mr. Ball and Mr. Baldwin exchanged a series of e-mail messages assessing the weaknesses of the *Johnston* case. (Defendants' Exhibit G). One of Plaintiffs' claims of negligence was that Mr. Johnston overdosed on Demerol with a 100 milligram dosage. One hundred milligrams is the recommended dosage for the average person, but Mr. Johnston weighed only 100 pounds, and he was given other sedatives (Depakote for seizures and 40 milligrams of Valium), so the dosage should have been reduced 25 to 50 percent. (Trial Tr. V.I P.85 L.5-21). In the email exchange, Mr. Baldwin explained to Mr. Ball that the "Demerol was given in multiple doses totaling 100 milligrams but over the course of an hour and a half or so, with his last dose being around 1:45." When Mr. Ball asked how a medication with a half-life of about 30 minutes could cause an overdose more than three hours later, Mr. Baldwin explained:

> The stuff is cumulative and has to interact with other medications and his metabolism, which, of course, is not normal since he is profoundly, neurologically impaired anyway -- profound mental retardation, blind, incontinent of bowel and bladder, gastrointestinal reflux, esophagitis, subject to seizures, so his reactions and reaction times will be erratic. Same as conditions which cause experts to say need to be hospitalized for this.

Mr. Ball testified that he had no reason to believe the records were not clear concerning the doses. (Trial Tr. Vol.I P.85 L.22-P.87 L.3). In the e-mail, Mr. Baldwin went on to state that Plaintiffs' expert would likely give an opinion that the overdose was the cause of death and that there is support for that conclusion "in the literature." (Trial Tr. Vol.I P.87 L.4-8, P.88 L.5-12).

Mr. Ball testified he believed that "there [was] no dispute; it was uncontroverted that, one, the [breathing] tube was not placed in the trachea and, two, an improper amount of time went on before the discovery of that took place." He also agreed that MPC "knew from the EMS records that it wasn't Dr. Bubenik who discovered the bad placement of the tube; it was the EMS people who discovered that." (Trial Tr. Vol.I P.89 L.19-P.90 L.1). Then another exchange about Defendants' Exhibit G records:

> [Y]ou [(Mr. Ball)] write, "From my perspective, Plaintiff has not yet satisfactorily met his burden of proof in this case." Baldwin responds, "I think he will meet it in spades." What did that mean to you?
>
> A. Again, I think the message he was receiving -- he was sending to me at that point, again, consistent with the concerns he had about Dr. Bubenik's refusal to testify and inability or refusal to provide any kind of explanation to what was in the chart -- you know, absent Dr. Bubenik's testimony, this chart on its own was -- with the other evidence the Plaintiffs were going to submit, he believed that they would meet their burden of proof.
>
> Q. Then you say, "It also appears that Bubenik's testimony explaining what happened is critical to building our defense." Mr. Baldwin says, "Certainly, the record is devastating without it. I don't know one way or the other what he might have to offer that would exonerate him, but the records certainly don't ." You had that advice; you received that advice, Mr. Ball, didn't you?
>
> A. That was always the problem with the case. He certainly communicated that in the -- in his email, yes, that the record on its own is devastating without an explanation from Dr. Bubenik.

(Trial Tr. Vol.I P.90 L.9-P.91 L.9). Mr. Ball was shown his deposition after he was asked if he agreed with Mr. Ball that the records were devastating, after he testified that he did not think he had ever expressed an opinion on that point. He was shown his testimony earlier recorded as follows: "Would you agree that the record is devastating without Bubenik's testimony? Yes, I would accept the characterization of the record as very problematic without an explanation."

(Trial Tr. Vol.I P.91 L.21-25, P.92 L.15-20).  Mr. Ball also agreed that Mr. Baldwin had expressed concern about the fact that Dr. Bubenik had used Narcan to reverse the Demerol, despite the fact that "[v]arious authors, including well-known medical schools, say that Narcan is totally ineffective to reverse Demerol and it can actually worsen the sedative effect, so it should not be used with Demerol."  (Trial Tr. Vol.I P.94 L.23-P.95 L.7).

Concluding the email exchange between Mr. Ball and Mr. Baldwin, and still discussing the problems the defense faced in the case, Mr. Ball stated:

> "We need an explanation that -- if we are to have any hope of being able to properly evaluate this case.  If the chart cannot be relied on, then Bubenik's explanation and testimony is absolutely critical.  Without it, much of your evaluation can only be supposition."

> Baldwin responds, "What we know is that he is not testifying, so we know the records will be the evidence, along with whatever testimony of others, which as you know is little to nothing helpful, so we can evaluate the case pretty closely as far as the evidence because it is mostly records. . . .  I don't see it as supposition at all.  It is what Plaintiffs will be allowed to argue about what the known records and evidence reveal."

(Trial Tr. Vol.I P.95 L.22-P.97 L.2).

Mr. Ball explained why Mr. Baldwin was recommending that the *Johnston* case be settled and not tried:

> Q.  (By Mr. Bauer) Would you agree that Mr. Baldwin's letter was telling you that it was his recommendation that you attempt to settle the matter rather than try to defend it on liability in the *Johnston* claim?

> A.  Mr. Baldwin was of the opinion we had an "Alice in Wonderland" shot on a client that we couldn't -- that was not able to explain it and without that, that was impeding our ability to retain experts and impeding our ability to defend the case, and all those things considered along with the fact that he was continuing to plead the Fifth and unwilling to explain those -- those criticisms, it was his recommendation that we settle the case, yes.

Q. All right. And that also included the fact that the *Jaudon* case had occurred approximately six months before the *Jaudon* matter or the *Johnston* matter?

A. Yes, he did make reference to that, yes.

Q. All right. And, in fact, Mr. Baldwin recommended to you that the primary defense should be focused on limiting the amount of damages by limiting the amount of noneconomic compensatory caps available under Missouri law?

A. That was in his letter, yes.

(Trial Tr. Vol.I P.121 L.5-25).

Mr. Ball believed, and testified, that Dr. Bubenik, if he had been willing to testify, would

have been a very good witness:

[A]s I understand it, Dr. Bubenik has been practicing in dentistry for 25 to 30 years. He has taken an interest in a particular element or segment of people, including mentally and physically handicapped patients. It's -- that's an area of practice that I think very few dentists specialize in. I think he has some unique expert insights that come from a practice that involves treating physically and mentally handicapped patients. Those insights would have been invaluable to share with an expert who, perhaps, doesn't have those same experiences, that same practice and those same insights. Dr. Bubenik -- it was always -- I was always told -- made a very good witness. Having met him this morning, I have no reason to doubt that he would have made a very good witness. I think he presents a sympathetic story, which would have endeared himself to juries in a jury trial, with the willingness and the extent to which he went to take care of patients in the community that very few other dentists would take care of. There was a very persuasive story that Dr. Bubenik could have told in terms of his practice, in terms of his experience. He'd never previously been sued. He'd never had any prior problems with the disciplinary board. He's an expert in treating patients that are mentally and physically handicapped. No one knows better about how to treat those patients than someone who does that day-in and day-out as part of their practice. Those are the kind of unique insights, and actually, we saw the -- the 11 points that provided various suggestions for alternative cause of death. It was Dr. Bubenik's belief that -- I think all of those causes of death, potential causes of death that were at issue in these lawsuits -- in his opinion, the chances of those being the cause of death were very low. He believed there were other reasons that had absolutely nothing to do with anything he did. Just like in the *Jaudon* case, there was nothing -- the testimony of the independent, impartial witness, the coroner, was that he died of natural causes. Patients that are physically and mentally handicapped have -- are at a higher risk of death from other things earlier on in life.

(Trial Tr. Vol.I P.134 L.22-P.136 L.15).

Mr. Ball testified that he was aware that Mr. Baldwin had consulted a Dr. Ames as a potential expert witness who would not support a defense in the *Johnston* case. (Trial Tr. Vol.I P.120 L.8-11). He testified that he did not believe that the possible causes of death of Mr. Johnston suggested by Dr. Bubenik or the background and training of Dr. Bubenik were shared with the consulted expert, Dr. Ames. Mr. Ball related that Dr. Bubenik believed that all of the claims could be entirely defended, but "none of that was shared with Dr. Ames." (Trial Tr. Vol.I P.136 L.16-P.137 L.5). Mr. Ball admitted that MPC did have the following for defense of the case: literature, testimony of Dr. Bubenik's employees, Dr. Bubenik's records, the entire chart,[1] the EMT's records, St. Mary's Hospital records, a consultation with Dr. Ames, depositions from the *Jaudon* case and the input of the MPC attorney, Brent Baldwin. (Trial Tr. Vol.I P.143 L.13-P.145 L.5).

Kenneth W. Bean is an attorney with Sandberg, Phoenix & Von Gontard, P.C. He is a highly-qualified expert in the field of medical malpractice, and a member of the prestigious American College of Trial Lawyers. (Trial Tr. Vol.I P.155 L.11-24, P.157 L.10-16, P.158 L.5-11). He reviewed many documents, records and depositions related to this case and offered his opinion regarding the importance of a defendant's testimony in a medical malpractice case. He testified that a physician's thought process is critical to understanding medical records, because they work with "differentials," "so when an event happens, you have a given pain, a complaint, and then you work up what you think it is." (Trial Tr. Vol.I P.167 L.18-23). He testified,

---

[1] Mr. Ball characterized the "chart" in the words of Mr. Baldwin as "an Alice in Wonderland chart."

[t]he physicians then have to tell you what their thought process was, and oftentimes, it's not in the chart, and I regularly do lecture physician groups and say that if you can demonstrate to a jury your thought process, even though you may have taken the wrong approach in your process, your differential, it's usually a defensible case. So the goal is to figure out why the doctor did what they did, and that could be as simple as why did they take them to surgery as opposed to medical management. It could be why did they choose these drugs as opposed to other drugs. When this event happened, what did they do, who did they call?

(Trial Tr. Vol.I P.167 L.24-P.168 L.10).

Mr. Bean testified that the only thing more important than a physician testifying at a deposition "is the testimony at trial by the doctor." (Trial Tr. Vol.I P.168 L.23-P.169 L.1). He explained in more detail:

Q. Well, why is that? I assume that some of the issues are very similar in both cases, but the trial being more critical, what is it about the doctor's testimony that is so essential to the case, the defense of the case?

A. Well, the problem is that the medical records -- my impression and understanding from working with lots of plaintiffs' lawyers is that they screen their lawsuits based on what's in the chart. If the chart has holes in it, that's a plus to the plaintiff and to their lawyer, and, you know, therefore, your physician has a -- has the ability to -- I'm going to call it plug the gaps and explain their thought process and their rationale, and that deposition then is useful for a variety of purposes. One, it may persuade the plaintiff that the case isn't as good as they thought it was. Two, that deposition is then used by all the experts, both the plaintiff's and the defense experts, to say this is what happened. So in terms of the most important first thing that happens, I guess you'd say the first thing is I usually get to depose the plaintiff first, and then the doctor comes second, but from my side of the case, the doctor's deposition or the nurse's deposition is the first critical pitfall, if you will, in the defense of a malpractice case.

Q. To what extent -- let me ask a simple question. Do you consider the doctor to be the most important witness in the defense?

A. Yes.

(Trial Tr. Vol.I P.169 L.2-P.170 L.2). He explained that the doctor's testimony is multi-faceted and can be beneficial in proving duty, breach, causation and damage in a medical malpractice

case: "They can talk to you about what they did and why they did it. They can talk to you about whether they breached some standard, whether it was an act or omission, and then they've got a damage component often to it of what's the prognosis for the patient now, if you will." As a result, when defending a medical malpractice case, the physician "has a huge role in my defense strategy and a huge role in subsequent decision making on how I'm going to progress with that case to trial." (Trial Tr. Vol.I P.170 L.8-21).

Mr. Bean further testified that in every case he tried he had the medical professional sit with him at the counsel table and testify. He said the purpose of having the doctor testify is to personalize the doctor for the jury. He said that in St. Louis County, the jurors expect that and if you fail to meet their expectations, it is "usually bad news for the defense." He testified that if a physician fails to appear, "the logical conclusion for those jurors is that he's not going to help his own defense, both of which are very bad things in my line of work." (Trial Tr. Vol.I P.170 L.22-P.171 L.2, P.171 L.3-7, 8-17).

Mr. Bean testified that based on his experience as a medical malpractice defense attorney and review of materials surrounding the *Johnston* wrongful death claim, to a reasonable degree of certainty, MPC suffered substantial prejudice in the defense of the *Johnston* wrongful death claim. He said that the invocation of the Fifth Amendment privilege by Dr. Bubenik was a substantial impediment to the insurance carrier and the insured, in terms of the percentage risk at trial, as well as the dollar exposure either at trial or settlement. (Trial Tr. Vol.I P.176 L.11-18, P.177 L.7-16). Mr. Bean specifically addressed the manner in which assertion of the Fifth Amendment by Dr. Bubenik affected the defense of the case:

Q. Mr. Bean, I'd like to break that down a little bit. What is it about the doctor's assertion of the Fifth Amendment that renders a zero percent chance at trial?

A. Well, lots of components, the first of which is certainly referenced in reports back from the two trial counsel, Mr. Wilke and Mr. Baldwin, to The Medical Protective, and it relates to the following subject. The court's order, both Judge Wallace and the earlier one, I think, by Judge Kintz, stated that one of the risks to the defense was that they could not use information they acquired from the doctor, in other words, information they acquired that was not available to the Plaintiffs. They could not use that in any fashion in their defense of the case or the trial. The best example of how that came to fruition and hurt the defense was when Judge Kintz struck the expert at the Plaintiffs' request -- I believe it was Tom Casey in the first trial, the *Jaudon* file -- and struck the defense using Judge -- sorry -- using Dr. Jane Turner, who was the pathologist who actually did the pathology study on the Jaudon child. That's a clear example of how information that was not available to the Plaintiffs in that case ended up messing up the defense because Judge Kintz said, "You can't call your causation expert because the causation expert had talked with Dr. Bubenik." So the first problem is that it substantially limits the ability of the defense lawyer to actually work with the insured, work with the doctor, and I started off describing how important it was to meet with your client and get them to fill in the gaps. The second problem it had is that the doctor took the Fifth at the deposition, and as I mentioned, that substantially prejudices the ability to win that case. The expert doesn't have it. Your expert doesn't have it. There's no way to fill the gaps in because of the court's order, so it's a real problem. The third area that it impacts is that at trial, the doctor can't testify and, therefore, can't fill the gaps in. The fourth area is that under Missouri rules in the civil litigation arena, the plaintiff is allowed to call the doctor to the stand, if the court order allows it, and quiz the doctor about the medical facts, at which point all indications were that Dr. Bubenik was going to claim the Fifth, and in a civil setting, that would allow a negative inference, at which point I think certainly all the defense lawyers of the world and I think most of them would say all of the jurors of the world and most of the jurists of the world would say in a civil setting, if you are not prepared to defend yourself, you must have something to hide. So I believe that it impacted the way the lawyers were able to do their job. I believe it impacted the way the lawyers would be able to present a cohesive and understandable defense in the face of a chart that does have substantial gaps in it, and I'll be glad to discuss those if you choose to.

Q. We'll get to it in one minute. One brief question before we move on. How does it affect -- the insured asserting the Fifth Amendment -- how does it affect the ability to personalize the doctor with the jurors? Obviously, it's –

A. You can't. Everything you try to do with proving up their resume, where they went to school is going to be for naught, and I can't predict what any given judge will do nor what particular lawyers will do, but, you know, I'm not sure that the trial judge

would have even allowed Dr. Bubenik to get on the stand and describe his medical background because he's going to claim the Fifth, and I'm not sure Dr. Bubenik would have even described his medical background. He was very careful in his depositions as to what he answered. I'm not sure you could have personalized him at trial, and secondarily, you know, we look around this courtroom, and who's helping whom? In most courtrooms, when I sit with my doctor, they're passing me notes and I'm passing them notes. You couldn't -- the defense lawyers couldn't have done that in this case because you can't pass a note to the doctor and get inside information and then use it for your defense, and I have to tell you, if -- if there had been a private interview in detail of the medical facts and then I stood up or Mr. Baldwin stood up or any defense lawyer stood up for that matter, the standard of practice and custom, if you will, for malpractice defense lawyers, if you stood up in the courtroom and asked a question that it was apparent you had inside information, in other words, the doctor had told you something, the judge would have come down pretty hard, and at that point in time, they're going to ask you, "So where is your knowledge coming from?"

(Trial Tr. Vol.I P.178 L.3-P.181 L.9).

Mr. Bean also offered an opinion as to the contribution Dr. Bubenik could have made to the case:

Q. Mr. Bean, based on your review of the case, what specific items could Dr. Bubenik have contributed to the defense?

A. Many. . . . Dr. Bubenik could have explained his thought process, why he needed to do the case he did, why this child needed the procedures and had the teeth extracted. He could explain his thought process about why he did it in the office, which was one of the issues raised by Judge Wallace in her order. He could have told the jury that he was there the entire time. He could have told the jury the vital signs that are in his office chart that his staff couldn't read, including Ms. Dakova, who said she couldn't read that last set of vital signs. He could have told the jury when the respiratory effort stopped and when the cardiac effort stopped. Those are different things in the medical world. So he could have explained whether this was a primary respiratory arrest or a primary cardiac arrest or whether it was respiratory leading to cardiac, and he's the only one that would have known that information. Ms. Dakova testified that he had a stethoscope, that he walked into the -- he was in the room and listened to the heart and there was something about the heart rate that troubled him, at which point he asked for the Ambu bag. She didn't know what that number was because he didn't tell her and it is not recorded in the chart. He could have described his intubation. He is the one who inserted the tube into the throat or the esophagus, depending upon who you believe. He could have described how he did that, why he did it, and when he did it. Those things are not recorded in the medical record. Once

20

you intubate a patient, you then do certain things, which are not in his record. Those things are you look at the chest to see if the chest is rising and falling. You put your stethoscope on the lungs and see whether when you press on the bag to squeeze through the endotracheal tube you're getting air into the lungs or to the stomach. There is a debate here as to whether this was an esophageal intubation or a tracheal intubation. That's reflected in the records from the EMS service. He could have described that he did listen to the chest, what he did and what he saw, which would establish the reasonableness of his efforts at intubating this patient. We deal often with code situations and intubations, and as a defense lawyer, I think many plaintiffs' lawyers and their experts would agree misintubation is not malpractice. The failure to discover that you have misintubated it could be malpractice. He could explain why that happened. He could explain the intervals of time that are not documented in the chart. He could explain how fast he asked the office staff to call 911, which was one of the subject matters raised by Judge Wallace in her order.

(Trial Tr. Vol.I P.186 L.1-P.188 L.5).

Mr. Bean testified that Dr. Bubenik could have addressed the problematic subject areas

raised in Judge Wallace's judgment in the *Johnston* case, presumably before judgment was

entered:

Paragraph (8)(d) of her judgment, she had four separate events or occurrences. The first one was why did he do it in the office. The second one was the meds given, the medications given, were greater than was acceptable for the weight and size of the patient. The third complaint, the third issue she found was that the emergency procedures were below the standard of care and that the Ambu bag was not immediately available and he did no CPR, and the fourth issue in her order was that he delayed calling 911. Dr. Bubenik is the only one from his staff who was deposed[2] who could give that time frame. The -- one of the key issues is the chest compressions, the CPR. That is a hole in the chart. If you look at Dr. Bubenik's office chart, it does not mention that he did CPR. It mentions the intubation and the Ambu bag. In Dr. Bubenik's report to the Missouri Dental Board, which he had supplied to The Medical Protective, he listed that he did both intubated with Ambu bag and CPR. That is the only reference to him doing CPR. He was the one that was going to have to say he did it.

Q. And to be clear, that information was not in the litigation medical records?

---

[2]The deposition of Dr. Bubenik to which Mr. Bean refers was taken in this declaratory judgment case, on May 16, 2008, after the criminal statute of limitations had run. Dr. Bubenik did not give deposition testimony in either the *Jaudon* or *Johnston* cases.

A. Correct. It is not in his office chart, and the -- the significance of that is that when the EMS crew gets there, they chart in their record, which would go into evidence, that there were no chest compressions underway. So the chest compression issue as part of a resuscitation is a key item, and Dr. Bubenik is the only one who -- who wrote anywhere that he did chest compressions, and he said it to the state board. We know from his documentation to the state board, we know from the documentation that he provided to his criminal defense lawyer -- I think it's Mr. Rosenblum -- that he thought he had defenses. He outlined what those were. He outlined the causation defense he had. And we know from his deposition that he denies liability. He said he disagreed with the four conclusions of Judge Wallace and that he didn't think he committed malpractice. There are many, many ways that he could have helped. All of those would be things that aren't in the chart, the key items being why did you do it in the office, how did you resuscitate this patient, why did you choose the medications you did, had you used them before successfully in other patients, how did you intubate the patient, and when did you call 911. All of those were the substantive matters that aren't in this chart that required his testimony.

(Trial Tr. Vol.I P.188 L.11-P.190 L.5).

Mr. Bean also gave testimony about the impact of various elements in calculating the dollar exposure of a particular case. In this case, he noted that "the key elements are who is the patient here, the decedent, and who are the plaintiffs. You, obviously, factor in the venue, which I've told you is a very conservative venue in St. Louis County. You factor in who the lawyers are. You factor in who the players are, if you will . . . ." He noted that in this case, the decedent especially impacted the dollar exposure because he "was 45 years old at the time of the event. He was disabled with severe mental retardation. He had bilateral blindness. He was in a group home called Emmaus . . . Home. He was part of the St. Louis Regional Center, which is the regional center in St. Louis for retarded citizens." (Trial Tr. Vol.I P.195 L.2-12).

Finally, Mr. Bean addressed the timeliness of MPC's issuance of a reservation of rights letter. He looked at all of the communications between the carrier and the insured and the carrier's representatives and the insured as well as the "doctor's representatives and the doctor."

22

He noted that Dr. Bubenik was warned that his conduct and refusal to change his mind would gravely affect the defense; that in the insurance company's opinion he was not cooperating and his coverage was in jeopardy. Mr. Bean noted that the order of Judge Wallace clearly prohibited Dr. Bubenik from testifying at trial, "unless within a reasonable time before trial he withdraws his assertion of his rights against self-incrimination." (Trial Tr. Vol.I P.206 L.1-P.207 L.24) (Pl. Ex. 5).

Brent Baldwin is the Member In Charge of the St. Louis law office of Lathrop and Gage with an area of practice including tort litigation, in general, and professional responsibility, specifically, medical, claiming, unchallenged, to have tried more medical malpractice cases than anyone in St. Louis. (Trial Tr. Vol.II P.3 L.10-P.4 L.6, P.4 L.20-P.5 L.1). He is a member of the American College of Trial Lawyers. (Trial Tr. Vol.II P.5 L.9-14). He represented Dr. Bubenik in the *Johnston* litigation after Dan Wilke, when Dr. Bubenik informed MPC that he wanted different counsel. (Trial Tr. Vol.II P.6 L.6-16). He entered his appearance in May or June, 2006. He testified that, prior to entering this appearance, the records were obtained and depositions of Dr. Bubenik's employees and the EMT response group had been taken. He was aware that Dr. Bubenik had asserted his Fifth Amendment privilege when he first entered the case. He testified that he believes that he received that information from Dan Wilke when the case was transferred, but he may have learned that from Company personnel. (Trial Tr. Vol.II P.6 L.22-25, P.7 L.6-18). When asked what he had available for review when he "took over" the *Johnston* case, Mr. Baldwin responded that he had EMT records, St. Mary's Hospital records, the death certificate, depositions taken in the *Johnston* case including those of Dr.

Bubenik's staff, and the deposition of the expert in the *Jaudon* case, which Mr. Baldwin "knew was going to be the expert in the *Johnston* case." (Trial Tr. Vol.II P.69 L.16-P.71 L.3).

Mr. Baldwin knew that Dr. Bubenik had asserted his Fifth Amendment rights in relation to answering interrogatories and he had already asserted those rights at his deposition. (Trial Tr. Vol.II P.8 L.9-15). Judge Barbara Wallace, St. Louis County Circuit Judge, had already entered the December 20, 2005 order restricting Dr. Bubenik's role in the case as long as he relied on his Fifth Amendment privilege[3] and Mr. Baldwin had checked with Dr. Bubenik's criminal counsel. (Trial Tr. Vol.II P.9 L.9-16, P.10 L.2-4). As a result of this order, Mr. Baldwin had to decide whether he was going to talk to Dr. Bubenik about "the merits of the case at all," since Dr. Bubenik,

> could not, under this order, get up and testify and add to the records or provide any facts that weren't already provided in the records or in other depositions, then I had to decide what was the best choice for me, and I thought the best choice - - still do - - at least at the outset was to not talk to him about the merits at all because talking to him about the merits could cause three problems - - well, two. One - - the third one I say is talking to him about the merits would not, in my opinion, since I'm his lawyer, have waived his privilege, so I don't think that's really an issue, but the two problems it could have caused in the civil case would be, one, it could keep me from using evidence. As I understand it, there was an expert, according to Wilke, that had been excluded in the *Jaudon* case. . . .
>
> Q. And that played into your decision? At the time, you were aware of the *Jaudon* expert being stricken?
>
> A. It did. I think I'd have decided the same thing even if I wasn't because I could see how that could happen, and keep in mind, he can't add anything to the records, so it's really just dangerous to be talking to him at that point in time. I also want to be able to tell the court, without even blinking or hesitating, that whatever evidence

---

[3] Judge Wallace's Order provided that Dr. Bubenik could appear to testify, but only to assert his Fifth Amendment privilege. It also provided that within a reasonable time before trial he could withdraw his intention to rely on his Fifth Amendment protection and make himself eligible to testify. (Trial Tr. Vol.II P.20 L.17-P.21 L.8).

somebody's challenging that might be tainted by him could not be because I never even addressed the merits with him ever, so that's one of the reasons for doing it, and the other reason is he might provide me with some sort of fact that isn't in the record that's different than an assumption that an expert might make, and if I've never asked him and an expert makes assumptions about what was done and why it was done and he gets up and testifies, that's all right, but if I've asked him and the expert gets up and testifies about what he presumes was done and why and the doctor has told me it didn't happen that way or those weren't his reasons, then I have a problem with candor to the tribunal, and I can't sit there and let somebody perpetrate what amounts to a fraud on the court and/or the jury by a doctor talking about assumptions that I know to be invalid assumptions because my defendant has told me they're not true. So there really was little to nothing to be gained, certainly, at this stage of the case, and there were some real dangers in talking to him about the merits in my point of view. Not everybody would view it that way. That's how I looked at it.

(Trial Tr. Vol.II P.10 L.2-P.12 L.1). Neither Dr. Bubenik's criminal attorneys, Mr. Leonard, his private attorney, nor MPC ever instructed Mr. Baldwin to take another approach, nor did they tell him to refrain from speaking with Dr. Bubenik. It was entirely Mr. Baldwin's decision. (Trial Tr. Vol.II P.13 L.2-14). On cross-examination, Mr. Baldwin testified that he thought Dr. Bubenik would have talked to him if he would have allowed him to do so. (Trial Tr. Vol.II P.64 L.5-8). In fact, Mr. Baldwin said that Dr. Bubenik wanted to talk to him about his case at the mediation and that "he might have either said he had [brought materials] or something, yes." Mr. Baldwin did not look at those materials. (Trial Tr. Vol.II P.64 L.24-P.65 L.1, 9-14).

Mr. Baldwin concluded that Dr. Bubenik's decision to assert his Fifth Amendment rights affected his ability to present to a potential expert witness information that expert would normally need in his or her review and testimony. He explained that it prevents him from giving the expert any information that is not in the record, and this has a negative impact because the doctor always has something to add to the record. The expert cannot consider the doctor's corrections to or clarifications of the record because the doctor will not be testifying about them

at trial.  (Trial Tr. Vol.II P.19 L.9-24).  Mr. Baldwin said that he did consider a dentist named Ames to be a potential expert witness, but Dr. Ames was not supportive because "what bothered him most of all was that [the procedure] wasn't done in the hospital and the things that stem from that."  Dr. Ames wanted a history and physical from the doctor that regularly treated him to say that it was okay to do this anesthesia.  (Trial Tr. Vol.II P.82 L.20-P.83 L.9).

Mr. Baldwin also explained the impact upon a jury when a defendant asserts his Fifth Amendment rights:

> [G]enerally, I think it is considered an admission of not just guilt but extreme guilt because the average juror -- if the plaintiff even explains anything about the privilege, the average juror is going to say, gee, this guy or gal just refused to testify because they're concerned that if they did they would wind up criminally responsible for what happened here, and so that's the worst possible branding you could put on somebody, so it's a terrible impact.  I think it makes cases unwinnable unless you can prove around it and to circumstances.

(Trial Tr. Vol.II P.21 L.15-24).   When asked to explain those circumstances, Mr. Baldwin answered:

> One, that the records are so perfect for the doctor that the experts can rely on the records and say the doctor made all the right choices; "I don't care if he is convicted of narcotics and was using them at the time; he made all the right choices; he made the same choices I would have made, and I am the head of Mass General anesthesia or whatever."  You can do that.  The other is if you can prove with some sort of near ironclad, objective, irrefutable evidence that the injury that's being claimed could not have been and was not caused by the negligence that's being claimed.

> Q.  In the *Johnston* case, were the records in such a state where you could rely on them for a defense, in your opinion?

> A. They were not.

(Trial Tr. Vol.II P.22 L.1-14).

Mr. Baldwin explained that in the *Johnston* case the records were bad for the doctor both as to liability and causation. (Trial Tr. Vol.II P.22 L.16-18). He testified that as to the causation defense, "the causation looked like it was very much a function of what happened or what the allegations were, close enough to it that without somebody changing or adding to the record, I don't see how we would have gotten out from under that." (Trial Tr. Vol.II P.23 L.9-12). Mr. Baldwin concluded that with information from Dr. Bubenik, Mr. Baldwin could have discussed possible facts that would constitute a causation defense. (Trial Tr. Vol.II P.23 L.13-18).

Mr. Baldwin explained the effect of Dr. Bubenik's reliance on the Fifth Amendment:

> Well, the exposure, I set out in one or more reports, so the exposure was huge because I thought with the Fifth Amendment the case was basically at the totally unwinnable, maximum value level, and I was telling them they're asserting two independent acts, therefore, entitling them to two caps under the *Scott* decision, arguably, depending on how you interpret it, and they better be prepared for that level of a jury outcome.

(Trial Tr. Vol.II P.24 L.18-25). Mr. Baldwin was specific in citing factors when giving advice to MPC:

> This is a 45 -- 40-45-year-old gentleman that died, and if that were -- if that were a really unfortunate thing, the doctor tried hard, did his best, everybody felt like it was a good doctor, it was a fluke, it was a horrible thing, the doctor couldn't sleep about it, on and on and on, then the focus goes back to what's the real loss and not on the doctor's behavior or whether the doctor's a bad guy. Then in St. Louis County, which is terribly conservative, an adult with no dependents might -- might be, even in a death situation, as low as $200,000, 300,000. An adult who has special needs, like this one, is sometimes viewed by some jurors as not -- sometimes won't even place the same value on it. Whether you or I think that's right or not, they sometimes won't place the same value on it. They'll think that that person cost the family, the family meant well, they loved him, they lost him, but it was a cost to them, and so sometimes, for some jurors, that can drive a value down, but even if you take that out of it, an adult could go in the county for as low as two or three hundred thousand dollars. If you have family connections and things that are lost, which I discovered in the course of this that we thought that a sister that was kind of close to him was no longer around, but she was, that moves it up. It doesn't make it the two-cap case I was talking about, but it moves it up. What takes it into the stratosphere is the pleading the Fifth because then

all of the attention is on the doctor, all of the attention is this guy's escaping criminal liability but we can take care of it here civilly and we have to on behalf of the family and that's how they finally, you know, made O.J. pay, and all that kind of stuff come into it, and so that takes it to a whole other level in their heads. It's that level of impact or it can be.

(Trial Tr. Vol.II P.25 L.4-P.26 L.11).

Mr. Baldwin explained that if Dr. Bubenik was not going to testify and add to the record and explain differences between the *Jaudon* case and the *Johnston* case, the *"Jaudon* case is going to come roaring into evidence in this case, and on the face of it and on the records, it looked like there were a lot of similarities. So the *Jaudon* case, if you could not sufficiently distinguish it, was going to add to the value all by itself if it came into evidence, so you had to distinguish it or you were going to be in trouble." (Trial Tr. Vol.II P.26 L.23-P.27 L.4).

Mr. Baldwin also explained his belief that the testimony of Dr. Bubenik would have been very valuable:

I knew that he did this frequently, "this" being treated these kind of patients. We could get that out with the nurses. I knew that he had -- his own children, I think, had special needs, and so I think that's one of those things that matters to juries in terms of whether they think a doctor is going to be cavalier or take risks with them or treat them like second-class citizens, that sort of thing. I don't know that that could have come in other than through him. Generically, having the doctor testify is like -- there's a multitude of benefits to it. Number one is they have to know this is a real person, a caring person, somebody for whom this mattered, somebody that feels terrible about what happened. Even if they don't think they were below standard in this, they have to know that. If they think he's arrogant or just a criminal, then he gets no benefit. They have to know that he knows what he's doing. Having him up explaining, "I do this kind of sedation; I've done it for this many years; I've had this kind of experience in it," and seeing not just on paper, here's a CV or whatever, but seeing this guy's up here knowing this stuff, he's teaching it, I'm watching him. He's like, "I find him to be reliable; I think he knows his stuff." That's -- that's invaluable. I always put everybody through that unless I think they don't know their stuff, but I mean I always put everybody through that, a teaching exercise, so the jury can become familiar with that. Those are generically the things you can't do without the doctor personally, and then, of course, if we agree the doctor has things to say, which

they always do of some sort or another, that are different than the records, that add to or may even contradict them or whatever, that can't happen under the circumstance of a Fifth Amendment plea like that, and that by itself can make a huge difference. People can look at that doctor and say, "It's not in the record, but I believe him or her," and make their decision on the basis of that. A doctor can also be their own expert in their own defense. I've done that twice in the last three years because we couldn't find an expert, and we won both of them, so I'm not saying that was going to happen here one way or the other. I'm saying a doctor can be an expert in their own defense. Juries don't know that defendants also go out and get experts necessarily. They know plaintiffs do, but they don't necessarily wonder why the defendant didn't have an expert, so that works, too, sometimes. Those kinds of things are the affirmative benefits you get from somebody testifying that you don't get when they're not because of the Fifth.

(Trial Tr. Vol.II P.31 L.2-P.32 L.24).

Mr. Baldwin also discussed the documents that Dr. Bubenik did not turn over for use in the defense. Dr. Bubenik completed a form for the Missouri Dental Board after Michael Johnston's death where he revealed information about Cardio Pulmonary Recitation ("CPR") efforts on Mr. Johnston that did not appear in the medical record. Mr. Baldwin explained that this was important information to the defense because the "record doesn't talk about CPR and none of the [other dental employees] could remember that it was happening." (Trial Tr. Vol.II P.38 L.22-P.39 L.3, 17-22) (Pl. Ex.55). Further, the information had relevance because Plaintiffs were asserting that they were entitled to "two caps for two occurrences, two bad acts. One of them was causing the respiratory/cardiac failure, and the other was poor response to the respiratory and cardiac failure, and part of that would be the failure to institute and maintain CPR." (Trial Tr. Vol.II P.39 L.23-P.40 L.6). Because Dr. Bubenik asserted the Fifth Amendment, he could not testify about the CPR efforts either at deposition or at trial. Mr. Baldwin said he had no other way to produce the information because the other people present said they did not remember and the prior Court Order (Pl. Ex. 5) provided he could not use

anything that was being protected by reason of the Fifth Amendment and that was otherwise privileged. (Trial Tr. Vol.II P.40 L.7-23). Mr. Baldwin asked criminal counsel and Dr. Bubenik's personal counsel if he could give the information to MPC and both said "no." (Trial Tr. Vol.II P.41 L.3-11).

In May 2006, Mr. Baldwin sent a "Report Analysis" of the *Johnston* case to Bill Louthan, file manager for the case. (Trial Tr. Vol.II P.43 L.9-22) (Pl. Ex.B). Page six of Plaintiff's Exhibit B identifies specific problem areas of the case that Mr. Baldwin had identified and was concerned about at that time. The first problem area was the Fifth Amendment. The second was *Jaudon*, a previous similar case that could not be distinguished and would likely come into evidence. The third problem area was that "[t]he actions of the insured would pose a problem on their own." That, he said, meant that with the Fifth Amendment in the case, there were the records which could not be changed, and the actions of the insured based on the records looked bad. (Trial Tr. Vol.II P.44 L.12-P.45 L.11).

Mr. Baldwin concluded that Dr. Bubenik's reliance on the Fifth Amendment affected both the liability percentage assessment and the recommended value:

> I tried to explain earlier how this kind of thing affects the value and how the jury gets really carried away with trying to get the bad guy if he's up there pleading the Fifth, so the value, I think we've covered. The liability, it's the same situation. It's worse than if he's dead or infirm or too ill to testify because you not only cannot add to the record and supplement and, therefore, provide information for experts; you can't show the jury that he knew what he was doing, et cetera; you don't have his testimony, which you sometimes do when doctors die during the course of a case, and instead, you have him standing up with this brand on his forehead, "If I talk about this, I'm worried that I may be criminally liable," and so it just slams all the doors. You're -- you're stuck.

(Trial Tr. Vol.II P.46 L.10-P.47 L.1). As a result, Mr. Baldwin reported to MPC on his view of an "adverse verdict range" where the Fifth Amendment was at issue. He said that he did not think "that a jury was going to find a request for 1.2 or two million dollars outrageous . . . ." A final judgment was entered in the *Johnston* case for 2.4 million dollars. (Trial Tr. Vol.II P.47 L.7-22, P.48 L.6-10).

In response to a question on cross examination asking, "[i]f you threw out the Fifth Amendment, this was a difficult case to defend, wasn't it?," Mr. Baldwin responded "[i]f you threw out the Fifth Amendment, this could have been a difficult case to defend. I don't know. It was an impossible case to defend with the Fifth Amendment." (Trial Tr. Vol.II P.95 L.19-23).

Kevin O'Malley, called as a witness for Defendants, has been a trial lawyer for thirty-five years. He served in the United States Army and then worked for the Department of Justice in various cities throughout the United States. (Trial Tr. Vol.II P.119 L.24-25, P.120 L.3-4, P.121 L.12-P.122 L.19). He then practiced in two local firms before starting a law firm in Clayton in 1989, where he began his medical malpractice defense practice. In 2003, his firm merged with Greensfelder, Hempker and Gale. (Trial Tr. Vol.II P.122 L.20-P.124 L.6). Mr. O'Malley is a member of the American College of Trial Lawyers and is listed among *The Best Lawyers in America*. He is published in several recognized legal journals and has for many years been an author of the prestigious Federal Jury Practice and Instructions work, now known as *O'Malley, Grenig & Lee*. (Trial Tr. Vol.II P.124 L.13-19, P.126 L.4-6, P.126 L.19-P.127 L.21). He has experience in representing individuals who assert their Fifth Amendment rights in legal proceedings. (Trial Tr. Vol.II P.130 L.13-25).

After reviewing all of the documents and based on Mr. O'Malley's experience and training, he testified that, in his opinion, MPC did not suffer substantial prejudice as a result of Dr. Bubenik asserting his Fifth Amendment rights. (Trial Tr. Vol.II P.138 L.2-7). He said, " I don't believe that there was any ability to defend the action of Dr. Bubenik in the *Johnston verses Bubenic* case. I think it was an indefensible case." (Trial Tr. Vol.II P.138 L.11-16). Mr. O'Malley read Dr. Bubenik's chart, material provided to him from Brent Baldwin's file, Dr. Bubenik's records, St. Mary's hospital records, and some of the *Jaudon* records; then he read the testimony, and eventually read Mr. Baldwin's deposition. (Trial Tr. Vol.II P.138 L.17-P.139 L.14). He considered efforts made to get an expert witness stating that there was "[a]bsolutely not" an expert who supported a defense. That was true both as to liability or causation or damages. (Trial Tr. Vol.II P.139 L.15-25). He testified that "'[i]f you don't have an expert witness, you cannot have a defense in a medical malpractice case." (Trial Tr. Vol.II P.140 L.1-10).

Reflecting on the issue of preferable venue for this case, Mr. O'Malley stated that he believed that there was no "good venue, period, for this case." (Trial Tr. Vol.II P.142 L.3-12). He testified that "given especially that there were these two incidents by one dentist where two people died as a result of what he did in a short period of time, in St. Louis County, I think this would have been a very explosive case, almost more in St. Louis County than St. Louis City, although neither place was a favorable venue for this." (Trial Tr. Vol.II P.142 L.13-25). He stated that he thought the citizens of St. Louis County would have been angry at what Dr. Bubenik did and that he believes that if a jury is "incensed," that generally affects the amount of

damages awarded.  That, he said, would also be true, in general, for an award of punitive damages.  (Trial Tr. Vol.II P.143 L.1-12,19-22, P.144 L.10-25).

The following related testimony of Mr. O'Malley came to the record as part of an offer of proof which was rejected by the Court.  Upon review of the record, the prior ruling is confirmed, except the following testimony concerning the timeliness of the reservation of rights letter will be considered, and to that extent, the prior ruling is reversed.

Mr. O'Malley testified that he believes that the issuance of the reservation of rights letter was untimely, because it was clear that Dr. Bubenik was going to assert his Fifth Amendment privilege after the *Jaudon* case.  He also said that it was clear that Dr. Bubenik was never going to change his view and that his highly respected criminal defense lawyer, Scott Rosenblum, was never going to change his view that the Fifth Amendment privilege was going to be asserted until either the statute of limitations expired or there was a revelation from the prosecuting attorney that the case was not going to be brought.   (Trial Tr. Vol.II P.151 L.6-24).  Mr. O'Malley further explained that Dr. Bubenik initially relied on his Fifth Amendment right on June 29, 2005, at a deposition in the *Jaudon* case, and on November 21, 2005, in interrogatory answers in the *Johnston* case.  (Trial Tr. Vol.II P.152 L.2-17).  However, the first time that there is a written record "that Dr. Bubenik was contacted and informed by Medical Protective Company that it was a problem - - his invoking the Fifth Amendment rights - - and that he should change that and testify . . . I have a note here, 8-24-06, that the insurance company wrote a letter to Dr. Bubenik and the discussion was that they were . . . forcing the carrier to choose which way to go here." The language in the letter was that "[y]ou're going to force us to take action if you don't change your - - your stance on testifying."  (Trial Tr. Vol.II P.153 L.6-18, 24-P.153 L.3).

On cross-examination, Mr. O'Malley testified that, in his opinion, expert testimony "is probably the most important aspect of a medical case from the defendant's point of view." (Trial Tr. Vol.II P.156 L.16-21). In fact, he has never gone to trial in a medical malpractice case without an expert witness. (Trial Tr. Vol.II P.158 L.2-7). He testified that he does not rely solely on the testimony of the defendant doctor because, irrespective of best efforts, many good doctors accused of causing the death of a patient or accused of injuring a patient cannot, in an unbiased or non-defensive way, explain as an expert can. When their professional competence is being challenged, doctors take it "very, very, very seriously . . . [and] it's hard for them to defend themselves because they get so emotionally attached to it . . . ." An expert, on the other hand, "can scientifically explain why the bad result that you have in every medical malpractice case -- why it happened." (Trial Tr. Vol.II P.156 L.22-P157 L.15).

Mr. O'Malley explained why he puts the client on the stand in a medical malpractice case:

A. I -- I put the client on the stand in a medical malpractice case in order to have the jury understand that the person who is being accused of injuring or killing the patient has a chance to humanize him or herself to the jury and then to explain, if they can, what happened in the underlying facts.

(Trial Tr. Vol.II P.193 L.2-7). Mr. O'Malley has used his client as an expert in a case, but never as a sole expert. He has used his client as an expert when he thought "the physician could provide good, persuasive, detached medical judgment which would be helpful to the defense, and [he] do[es]n't do it when that won't happen." He recognized that a doctor can explain gaps in the record and the doctor can provide mental impressions, "depending on the circumstances." (Trial Tr. Vol.II P.195 L.18-P.196 L.19).

Mr. O'Malley testified that he is not persuaded that the testimony of Dr. Bubenik would have been beneficial to the defense in the *Johnston* case because, after the criminal statute of limitations ran and Dr. Bubenik testified, he was deposed and testified that the records were accurate. (Trial Tr. Vol.II P.161 L.24-P.162 L.8). Mr. O'Malley testified, "[w]hat was he going to say that was going to make this case defensible? . . . I thought there is no way for him to talk his way out of it." (Trial Tr. Vol.II P.162 L.18-21). Mr. O'Malley testified that what he read in Dr. Bubenik's deposition would not "have helped his defense . . . . The medical treatment that's reflected in the records, which Dr. Bubenik said were accurate, has no defense." (Trial Tr. Vol.II P.164 L2-6,12-14). He went on to say that the conduct of Dr. Bubenik described in the medical records "shows some serious malpractice and some very serious risk taking." (Trial Tr. Vol.II P.164 L.19-21). He explained:

> You take Dr. Bubenik -- now, this is in *Johnston*, having just had the *Jaudon* experience a few months earlier, which -- which having spent some time with doctors and dentists over my career, that was a -- it would be a harrowing experience for anybody involved in that, for the victim, for the physicians, for the staff. To have something like this happen and result in death is a difficult situation for everybody concerned. Six months later, whether or not there was any training -- and the record is relatively breezy on that -- they take another patient who is medically compromised, use powerful drugs in amounts which are very questionable. They do it despite the fact that the primary attending physician recommended that this treatment be done in a hospital. They -- they elected, I think very -- in a very risky way, to do it at the -- to do it in an office. Then they do this, the procedures, the 25 teeth being extracted, and then the medications catch up with the patient, and the patient's condition catches up with the patient, and the patient goes into cardiopulmonary arrest, meaning his heart stops and his lungs stopped. Okay. That is an emergency. Of any, that's the major medical emergency --cardiopulmonary arrest. Blood's not circulating through his body. Oxygen's not circulating through his body. His brain is being deprived of oxygen and nutrients, and the toxins which are present in the body and are flushed out by the circulatory system are just congealing and just stagnant in this man's brain and in his heart. Having elected not to do the procedure in a hospital where it should have been done and saying we can do this and we'll take the risk that we'll do this outside a hospital setting, then they behave after the event occurs as if -- I mean the patient,

from what the records indicate, could well have been in the forest by himself. If they're going to take the risk of doing the procedure in the office, then they have to make sure that they can respond appropriately to an emergency if it happens. It's not the brick and mortar of the hospital that would have protected Mr. Johnston. It's the fact that there are people at the hospital and equipment at the hospital that can respond to the life-threatening situation which he was in. He had only minutes to fix the situation. In a hospital, when they have a code like this, you have emergency room physicians; you have intensivists; you have anesthesiologists; you have people who can respond and bring in the right equipment and who do this kind of procedure, if not routinely, at least, you know, frequently enough that you get through the emotion and they know how to do it and they get it done. Here, he doesn't -- there's an attempt to intubate the patient, and they're saying it all through the depositions. Nobody -- it's not a violation of the standard of care not to intubate someone the first time going around. That can happen, especially for a dentist. I mean even very skilled anesthesiologists won't always be able to do it on the first try, although they usually can, but a dentist would have a harder time because they're not just experienced at it, and that's no slam at Dr. Bubenik, but if you've got the patient not at the hospital and you've got him in your office, then you have to have -- you have assumed responsibility to get any crisis that's done handled correctly. They didn't intubate him correctly. I think everybody -- at least everyone I've seen who's testified in this case has agreed that once you intubate someone and you put the tube down their trachea in order to get oxygen to the brain, you have to check. Even the best anesthesiologists do this, and I've seen them do it where they put a stethoscope onto the chest, and you can hear whether air is going into the lungs, where it's supposed to go, or somewhere else. It is not rocket science. This part is -- although putting the tube in is difficult and I don't know how to do it, but Dr. Bubenik should have if he -- if he was going to do this procedure in his office. Then -- but if you -- if you're -- once you've done it, you've got to check, and some people say that you can actually see the patient's chest go up and down. I've never seen anybody rely on that. I see them put the stethoscope on the chest. They check the left lung, they check the right lung to make sure that the tube is down there. There's, generally, an expander at the bottom of the ET tube that expands to keep it in place, and then you can -- at least you know then as you're bagging -- there's generally something called an Ambu bag. Then they squeeze that, and that is forcing air then down through the trachea and then around and hopefully to the brain. You know, that didn't happen from the time this person went into cardiopulmonary arrest until the paramedics arrived. However long that was, this patient was actually -- his brain was deprived. His brain, which was already injured, was deprived of any oxygen. The doctors call that anoxic encephalopathy. It's often fatal, and it proved to be fatal in this case. The cardiopulmonary resuscitation is another issue. You know, did they -- did they do it? I don't know whether anybody's questioned this or not, but if they didn't do the ET tube correctly, I wouldn't -- I wouldn't have -- I wouldn't be confident that the CPR, if it was done, was done correctly, but in any event, both paramedics said when they

arrived that there was no CPR, so Mr. Johnston is getting no blood circulating in his body as a result of his heart having stopped, and chest compressions, which is the only way that Dr. Bubenik had available to him at his office since he elected to do it in his office rather than in a hospital -- that's the only tool he had, and he didn't do it.

Q.  In your opinion, was there anything that Dr. Bubenik could have told you if you were defending the case that you felt could have exonerated him?

A.  I've said I can't imagine it.  In the area of probability -- in the area of reasonable probabilities, I don't see it at all.  You know, something -- could magic happen?  I don't see it, and I was trying to look at this from the defense point of view, but I couldn't come up with a reason.

(Trial Tr. Vol.II P.164 L.21-P.169 L.7).  He went on to say that if Dr. Bubenik told him that he thought the case could be defended, he would tell the doctor that "I've put it out for expert support, and without expert support, you can't go forward.  It just can't be done."  (Trial Tr. Vol.II P.170 L.6-15).

On cross examination, Mr. O'Malley made a number of conclusions as to why the testimony of Dr. Bubenik would not have made any difference concerning his conclusion that the case was not defensible.  He acknowledged that he had never met Dr. Bubenik, and did not know if he would have been a good witness or a bad witness, as this is something you never know until the testimony is concluded.  (Trial Tr. Vol.II P.174 L.16-17, P.175 L.3-6).  He acknowledged that MPC never had the report Dr. Bubenik filed with the Missouri Dental Board dated January 29, 2005, where he indicated he started CPR, and that there is no reference to him performing CPR in the office medical record.  Mr. O'Malley testified that there were possibly four explanations as to why the information was in the Board report and not in his office record:  Dr. Bubenik forgot to include the information that he started CPR, he did not write in the chart that

he started CPR because he did not start CPR, he made a mistake, or he is lying. (Trial Tr. Vol.II P.179 L.20-P180 L.3, 14-24, P.182 L.19-P.183 L.10) (Pl. Ex.55).

Mr. O'Malley testified that he does not believe that the patient was ever properly intubated. He explained that if a patient is properly intubated, the tube will not become dislodged during chest compressions while performing CPR, because the inflatable balloon on the end of the tube will hold it in place. He noted that there is nothing in the medical record that suggests that Dr. Bubenik checked Mr. Johnston's breathing with a stethoscope to determine if the tube was correctly inserted in the trachea. Further, Mr. O'Malley noted that because the tube was in the esophagus instead of the trachea when the paramedics arrived, it doesn't really matter if he used a stethoscope or not - he either messed up by not checking to see if the tube was inserted correctly or by not correcting his mistake upon discovering it. (Trial Tr. Vol.II P.184 L.7-25, P.185 L.7-23).

Steven Leonard, licensed attorney, currently represents Dr. Bubenik. (Trial Tr. Vol.I P.236 L.25-P.237 L.10). Mr. Leonard represented Dr. Bubenik in both the *Jaudon* case and the *Johnston* case. (Trial Tr. Vol.I P.237 L.14-16). He testified that Dr. Bubenik supplied his records to Mr. Wilke in the *Johnston* case and that he "did everything he could to cooperate with Wilke." (Trial Tr. Vol.I P.241 L.18-24). When Mr. Wilke was in the presence of Mr. Leonard, Mr. Wilke had no reservations about talking to Dr. Bubenik. (Trial Tr. Vol.I P.242 L.4-9). Mr. Leonard testified that to his knowledge, Dr. Bubenik never refused to provide information to Mr. Wilke. (Trial Tr. Vol.I P.243 L.7-10). Mr. Leonard testified that there were likely other meetings where the *Johnston* case was discussed, but there was only one meeting where the *Johnston* case was discussed among Mr. Leonard, Mr. Wilke and Dr. Bubenik. (Trial Tr. Vol.I

P.243 L.17-20, P.242 L.8-20). He testified that at the mediation in the *Jaudon* case, Dr. Bubenik did not engage in discussions regarding treatment with the mediator. (Trial Tr. Vol.I P.245 L.4-9). Dr. Bubenik appeared at a deposition in the *Jaudon* case and "took the Fifth Amendment," and was not prepared to testify. (Trial Tr. Vol.I P.245 L.10-22).

Dr. Bubenik had training in IV Conscious Sedation in dental school; he did hospital rotations where he worked with oral surgeons in the hospital; and in his general practice residency, he had intense one to two month training in general anesthesia and spinal anesthesia and he extended a few weeks after that. (Bubenic dep. P.15 L.12-21). Dr. Bubenik's practice, before the *Jaudon* case, consisted of 30% mentally handicapped, a very underserved population. (Bubenik dep. P.16 L.7-15, 24-25). He testified that there are many challenges to treating mentally handicapped patients, including fear, lack of understanding, difficulty following instructions and physical problems. (Bubenik dep. P.18 L.22-P.19 L.7).

After the *Jaudon* death, Dr. Bubenik made several changes in his office in the way he performed conscious sedation dentistry. He improved his training and his staff's training through various methods, including reading books, monitoring, physical assessment and record keeping changes. Physical changes included positioning monitors, precordial stethoscope and labeling syringes. (Bubenik dep. P.20 L.13-P.21 L.25, P.22 L.10-16). He sent members of his staff for CPR training to either St. John's or the American Heart Association facility. (Bubenik dep. P.26 L.4-10). He did not receive any training he would consider relevant to handling emergency situations after the *Jaudon* death and before the *Johnston* death and he could not recall whether he sent his staff for any additional training. (Bubenik dep. P.31 L.16-24). He did not recall

discussing any of these changes with Mr. Wilke, and he did not talk to Mr. Baldwin or MPC. (Bubenik dep. P.24 L.18-25).

Dr. Bubenik testified that he understood that the Circuit Court judgment found that he committed four acts of negligence. He disagreed with almost all of it and believed that if he could have testified, he could have described the basis for his disagreement with the Court's findings. He did not testify because he was asserting his Fifth Amendment rights. (Bubenik dep. P.36 L.25-P.37 L.10; P.40 L l6-P.41 L.1). Dr. Bubenik testified that he did not have any meetings with Mr. Wilke in which he discussed the details of his treatment of Mr. Johnston. (Bubenik dep. P.42 L.7-13). He testified that he never had a meeting with Mr. Wilke where he discussed medical records relating to Mr. Johnston, he never had any telephone conversations with Mr. Wilke regarding the contents of his medical records, and he never had the opportunity to discuss with Mr. Wilke any of the factual information that he felt would bear on whether the findings in the Court's judgment were accurate. (Bubenik dep. P.43 L.6-25). Dr. Bubenik believed when his deposition was taken, with the opportunity to review his medical records, he could have explained the basis of his disagreement with the Court's judgment. (Bubenik dep. P.46 L.24-P.47 L.8).

Dr. Bubenik testified that he delivered a complete set of his medical records in the *Johnston* case to attorney Scott Rosenblum who was supposed to deliver them to Mr. Wilke. (Bubenik dep. P.71 L.2-18). He was asked, "Were those records accurate? In other words, did they take the information that you had at the time of your treatment of Mr. Johnston and accurately reflect the information of what occurred in that treatment?" Dr. Bubenik answered, "[y]es." (Bubenik dep. P.71 L.19-24). He then went through the entire file with counsel and

confirmed the accuracy of the entries, stating that there was no reason to change any of the records. He said the one time he talked to Antony Ball, he told Mr. Ball that his records were accurate and complete. (Bubenik dep. P.71 L.25-P.74 L.5). Dr. Bubenik said he did not prepare medical records concerning attempts to resuscitate Mr. Johnston, "because you need two hands." (Bubenik dep. P.98 L.20-24).

Dr. Bubenik recorded possible causes of death of Michael Johnston, about the time he was working with Scott Rosenblum, his criminal counsel. He listed eleven possible causes of death. He said there was an infinite number but those were the ones he came up with to that date. He did not provide the list to either Mr. Wilke or the MPC. (Bubenik dep. P.128 L.4-19, P.131 L21-P.132 L.4, P.133 L.3-20).

Mr. Wilke testified that even though Mr. Johnston died in January 2005, he did not learn of the death until March 5, 2005. (Wilke dep. P.19 L.13-22). Dr. Bubenik first recounted that he had reported the death of Mr. Johnston to MPC , but later accounted that he told Mr. Rosenblum, his criminal attorney, and relied on him to report the death to MPC. Dr. Bubenik admitted that when he had his meeting with Mr. Wilke in March of 2005, Mr. Wilke did not know of the second death, that of Mr. Johnston. After reading a letter he wrote to Mr. Rosenblum on February 12, 2005, to refresh his memory, Dr. Bubenik admitted that he was waiting for Mr. Rosenblum "to give the green light to tell Medical Protective Company." (Bubenik dep. P.85 L.25-P.86 L.25, P.88 L.6-P.89 L.15). When he eventually told Mr. Wilke about the death, he informed his attorney that Mr. Johnston was another mentally retarded individual, that Scott Rosenblum, his criminal defense lawyer, had his chart, and "we were not in a position to look over that particular chart." Mr. Wilke had learned that, after the second death,

41

University City Police made contact with Dr. Bubenik or his office regarding the two treatments. (Wilke dep. P.19 L.13-22, P.20 L.2-14, P.21 L.3-11).

Dr. Bubenik notified MPC that he did not want Mr. Wilke to continue with his case, because of Mr. Wilke's timeliness and his responsiveness to Dr. Bubenik, and in the *Jaudon* case, Mr. Wilke did not return phone calls and did not provide an expert witness. (Bubenik dep. P.48 L.21-P.49 L.17). Dr. Bubenik testified that MPC had hired Brent Baldwin to represent him after Mr. Wilke was relieved, and Mr. Baldwin never talked to him about the *Johnston* case. Dr. Bubenik said he wanted to talk to Mr. Baldwin and tried to call him, but did not talk to him, except at the mediation hearing on October 12, 2006. He took two medical books he wanted to discuss with Mr. Baldwin to the mediation hearing, but Mr. Baldwin did not talk to him. (Bubenik dep. P.57 L.22-P.59 L.12). Dr. Bubenik said he was dissatisfied with Mr. Baldwin for not communicating with him. He did not ask MPC to appoint another lawyer, because "I didn't think they were going to recommend another one, because I had talked to four attorneys by that time and none were wonderful, and so they wouldn't be somebody to ask." (Bubenik dep. P.144 L.14-P.145 L.2).

Dr. Bubenik said he remembers Mr. Antony Ball as a person who managed the attorneys for MPC. He said he had one telephone conversation with Mr. Ball when he discussed the *Johnston* case, and that the conversation occurred a few days before the mediation. In that conversation, they talked about the Fifth Amendment and his treatment of Mr. Johnston. (Bubenik dep. P.60 L.20-P.61 L.25, P.62 L.11-P.63 L.14). He testified that, before the mediation in October 2006, no one from MPC, no one at the Wilke firm, and no one at Mr. Baldwin's firm ever told him that he would lose coverage under the MPC policy if he did not

change his position with taking the Fifth Amendment in the *Johnston* case. (Bubenik dep. P.63 L.24-P.64 L.6).

Dr. Bubenik recognized, in part, his obligation under the MPC policy cooperation clause. He testified that he believed he was not required to answer the interrogatories because there "were multiple sources of information that could have been used, and a proportion of the questions that were in the interrogatory could have been answered without talking to me." He believed there was not any information that was not in the medical records that could have been conveyed to his attorneys. (Bubenik dep. P.95 L.8-10, 17-24, P.96 L.17).

Dr. Bubenik testified that he does not believe that there were facts that he could have provided to Mr. Baldwin to counter allegations or disprove allegations in the Plaintiffs' petition. (Bubenik dep. P.103 L15-P.104 L.5). However, he then testified that factual allegations *could* be countered and defended if they were addressed. He said he told Antony Ball that the lawsuit could be defended and that Mr. Ball told him that by "taking the Fifth Amendment it was a big problem." because "neither attorney could get information from [him]." He testified that he told Mr. Ball, "I was taking the Fifth, and my position didn't change."

Dr. Bubenik admitted that his relying on his rights under the Fifth Amendment affected the course of the litigation. He said, "[i]t had an effect, but it wasn't everything and anything about the case." He recognized that "[l]aymen assume that you are guilty when you say that because that's what they say on television, and so if there was a jury involved that most people in general take that to mean you are guilty." (Bubenik dep. P.123 L.25-P.124 L.11).

## II.      CONCLUSIONS OF LAW

## A.  STANDARD OF PROOF

It is well established in Missouri that cooperation clauses, such as the one at issue in this case, are valid and enforceable. *Riffe v. Peeler*, 684 S.W.2d 539, 542 (Mo. Ct. App. 1984). When there is a material breach of the cooperation clause by an insured, the insurer may deny coverage only if it can prove: "(1) the existence of substantial prejudice and (2) the exercise of reasonable diligence to secure the insured's cooperation." *Hayes v. United Fire & Cas. Co.*, 3 S.W.3d 853, 857 (Mo. Ct. App. 1999) (citing *Riffe*, 684 S.W.2d at 542)). The standard of proof in civil actions is a preponderance of the evidence. *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 548 (Mo. 2003) (en banc); *Bonney v. Envtl. Eng'g, Inc.*, 224 S.W.3d 109, 120 (Mo. Ct. App. 2007). Thus, in order to prevail in this case and legitimately deny coverage, MPC must prove, by a preponderance of the evidence, that there was a material breach of the cooperation clause that caused substantial prejudice to the insurer, who exercised reasonable diligence in securing the insured's cooperation.

## B.  BREACH OF THE COOPERATION CLAUSE

Before the Court can begin to analyze whether there was substantial prejudice and whether the insurer exercised reasonable diligence, it must first determine whether there was a material breach of the cooperation clause in the first place.

The language of the cooperation clause at issue provides as follows: "The Insured shall at all times fully cooperate with the Company in any claim hereunder and shall attend and assist in the preparation and trial of any such claim." (Pl. Ex. 1). Additionally, the policy issued by MPC to the Bubenik Defendants requires the insured to "notify the Company . . . , as soon as possible, of any threatened claim, with full information relative to the services rendered . . . ." (Pl. Ex. 1).

MPC alleges that Dr. Bubenik's failure to answer interrogatories, participate in discussions, share documents, answer deposition questions, and testify at trial together constitutes a breach of the cooperation clause. Defendants argue that the cooperation clause is ambiguous and, because the policy does not specifically require testimony from the insured, the Bubenik Defendants did not violate the terms of the policy by Dr. Bubenik asserting the Fifth Amendment and refusing to testify.

Missouri law provides that courts are to interpret all ambiguities that appear in an insurance policy in favor of the insured, however, when there are no ambiguities, the policy is to be enforced as written. *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo. 2007) (en banc). "An ambiguity exists 'when there is duplicity, indistinctness, or uncertainty in the meaning of the language,' and language will be deemed ambiguous 'if it is reasonably open to different constructions.'" *Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co.*, 62 S.W.3d 633, 637-38 (Mo. Ct. App. 2001) (quoting *Martin v. U.S. Fid. & Guar. Co.*, 996 S.W.2d 506, 508 (Mo. 1999) (en banc)). The language at issue in this case is clear and concise and, although brief, the clause effectively and definitively establishes what the insured is obligated to do. Even the insured in this case, Dr. Bubenik himself, had a clear understanding of what the cooperation clause required of him: "[i]t means *do what they ask* and copy records and answer their phone calls." (Bubenik dep. P.93 L.11-19) (emphasis added). The language comprising the cooperation clause in this case, the same language that is used in many similar insurance contracts nationwide, is clearly unambiguous and the policy must be enforced as written.

Having decided that the cooperation clause at issue in this case is unambiguous and enforceable, the next issue is whether Dr. Bubenik actually violated his duty to cooperate with

the insurance company.  Dr. Bubenik refused to answer interrogatories and refused to give

testimony at his deposition in the *Johnston* case.  (Trial Tr. Vol.I P.33 L.7-16).  He refused to

testify at trial.  (Trial Tr. Vol.I P.129 L.4-P.130 L.6).  He also refused to turn over documents

relevant to MPC's defense, particularly a report filed with the Missouri Dental Board describing

CPR efforts and a list of possible alternative causes of death made by Dr. Bubenik.  (Trial Tr.

Vol.II P.41 L.3-11) (Bubenik dep. P.128 L.4-19, P.131 L21-P.132 L.4, P.133 L.3-20).  The

documents that he did turn over, such as the medical records, were "complete," but did not

include critical information, namely Dr. Bubenik's mental impressions and general explanations

for his conduct.  (Trial Tr. Vol. I P.134 L.22-P.136 L.150, P.179 L.6-11).  All of the activities in

which Dr. Bubenik refused to take part are evidence that he failed to fully cooperate with the

insurance company, to assist in both preparation and trial, and to provide full information.[4]  His

failures fit squarely within the requirements of the cooperation clause, the same requirements he

undertook freely when he agreed to the terms of MPC's insurance policy.

---

[4]Contrary to much of the testimony, the Defendants assert that Dr. Bubenik was willing,
even "anxious," to assist in the defense of the *Johnston* action.  They cite to Dr. Bubenik's
unsuccessful attempts to talk to Mr. Baldwin about the case to suggest that it was Mr. Baldwin's
fault that they lacked the information needed to defend the case, rather than Dr. Bubenik's fault.
The Court finds this argument unpersuasive.  Mr. Baldwin testified extensively about his decision
not to talk to Dr. Bubenik about the merits of the case, explaining that he was worried that he
might be prevented from using certain evidence, as had happened with the expert witness in the
*Jaudon* case, and that he might have an issue with candor to the tribunal if a witness testified to
something that Mr. Baldwin knew was not true, based on the information he received from Dr.
Bubenik.   These are logical reasons that demonstrate the desire of this attorney to respect the
wishes of his client and to serve the client's best interests, considering the decisions that client has
made.  This is not proof that Mr. Baldwin prevented Dr. Bubenik from cooperating.  Further, Mr.
Baldwin's strategy would not have been necessary at all had Dr. Bubenik cooperated from the
beginning.

There are numerous Missouri cases in which general cooperation clauses, similar to the one currently at issue, have been interpreted to require the insured to perform activities that were not specifically set forth in the insurance agreement. *See Smith v. Progressive Cas. Ins. Co.*, 61 S.W.3d 280, 283 (Mo. Ct. App. 2001) (signing a consent judgment without notice to insurer breached clause generally requiring insured to "cooperate with [insurer] in any matter concerning a claim or lawsuit"); *Hayes v. United Fire & Cas. Co.*, 3 S.W.3d 853, 858-59 (Mo. Ct. App. 1999); *Meyers v. Smith*, 375 S.W.2d 9, 15 (Mo. 1964) ("A multitude of matters other than those specified in the section might be said to be included under the term [cooperate], depending upon the particular facts in the particular case."). Considering these cases and a common sense understanding of the clause at issue in this case, in addition to the fact that any other interpretation would require the insurer to foresee every possible future litigation need, it is clear that Dr. Bubenik materially breached the cooperation clause.

Defendants' argument regarding the contractual waiver of constitutional rights misses the point. They argue that when Dr. Bubenik signed the insurance contract with MPC, he was not made aware of the possibility that the contract's cooperation clause might require waiver of his constitutional rights, and thus, they allege that the waiver should be unenforceable. The problem with this argument is that the insurance contract at issue does not require an *actual* waiver of the insured's constitutional rights. Rather, under the terms of the insurance contract at issue, Dr. Bubenik had the *choice* of either cooperating with his defense attorneys and reaping the benefits of insurance coverage or invoking the privileges of the Fifth Amendment and relinquishing those

privileges.[5]  Both of these options remained available to Dr. Bubenik after he entered into the

insurance contract and, thus, it is clear that the contract itself did not require or call for a waiver

of the Fifth Amendment rights of the insured.  Furthermore, Dr. Bubenik was actually able to

assert his Fifth Amendment rights and to rely on those rights in his refusal to testify, without

substantial interference by MPC.  Thus, because the insurance contract at issue does not contain a

waiver of constitutional rights, Defendants' argument that the waiver of constitutional rights was

improper is immaterial.

Dr. Bubenik made a choice.  He could face having his statements in a civil case used

against him in a criminal trial that could result in his imprisonment, or he could refuse to

cooperate with his insurance carrier and insulate himself from giving incriminating statements, and

risk losing protection from his insurance policy.  He chose the latter.

## C.    SUBSTANTIAL PREJUDICE

Missouri law clearly states that there is no per se rule for what constitutes a violation of

the cooperation clause.  *Hendrix v. Jones*, 580 S.W.2d 740, 743-44 (Mo. 1979) (en banc); *see
also Riffee v. Peeler*, 684 S.W.2d 539, 542 (Mo. Ct. App. 1984).  Rather, "[i]n determining

whether the failure of an insured to attend trial or to testify was prejudicial to the insurer, the

---

[5]The cases cited by Defendants to support their waiver of constitutional rights argument,
deal with entirely different contractual provisions, specifically provisions that release a party from
future legal claims.  *See, e.g.*, *Erie Telecomms., Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1094-
1101 (3d Cir. 1988); *Fuentes v. Shevin*, 407 U.S. 67, 94-96 (1972).  A claim release provision
like the one in *Erie* or *Fuentes*, does not leave the bound party with a choice regarding his or her
basic procedural due process rights.  The party has agreed not to bring certain lawsuits against the
other party and that agreement will generally be enforced.  This is an actual waiver of
constitutional rights.  The cooperation clause in the present case, however, does not contain an
actual waiver because it still leaves open the opportunity for the insured to assert his or her
constitutional rights.

courts have generally considered the importance of the insured's testimony to the defense." *Hendrix*, 580 S.W.2d at 743 (internal quotation omitted). Determining whether a violation of a cooperation clause caused substantial prejudice is a highly fact-intensive inquiry.

Although the Defendants vehemently deny that Dr. Bubenik could have been of assistance, it is clear from the facts of this case that his testimony was, in fact, highly important to the defense of the medical malpractice claim filed against him. Expert witness Kenneth W. Bean, a medical malpractice attorney, testified that the defendant doctor in a medical malpractice case is "the most important witness in the defense," noting that the doctor can explain his or her thought process, fill in any holes in the medical records, and generally personalize himself for the jury. (Trial Tr. Vol.I P.167 L.18-P.171 L.17). He listed numerous specific pieces of information that Dr. Bubenik could have presented to the court that would have helped in the defense of the *Johnston* case, including: why the child needed the procedure, why Dr. Bubenik elected to do the procedure in his office, why he chose the medications that he used, the vital signs that his staff couldn't read, how he attempted to resuscitate the patient, a description of the intubation, and a time line of the events that occurred.[6] (Trial Tr. Vol.I P.186 L.1-P.190 L.5). All of these items were pieces of information that Dr. Bubenik possessed and that he alone was capable of giving testimony. Mr. Bean also testified that jurors expect the defendant to testify in a medical malpractice case and

---

[6] It is interesting to note that many of these pieces of information that Mr. Bean mentioned are directly relevant to the four separate occurrences of medical malpractice identified by the Circuit Court in the *Johnston* case: (1) the decision to undertake the procedure under circumstances that deviated from the accepted standard of care; (2) the amount of medication administered, which greatly exceeded the accepted amount; (3) the emergency procedures that were utilized, including the fact that an ambubag was not immediately accessible, CPR was not performed, the inter-tracheal tube was improperly inserted, and the staff was not properly trained; and (4) the failure to timely notify emergency personnel of the situation. (Pl. Ex. 36, pp. 5-6) (Trial Tr. Vol.I P.188 L.11-P.190 L.5).

failure to do so creates a negative inference that he or she has something to hide. (Trial Tr. Vol.I P.170 L.22-P.171 L.2, P.171 L.3-7, 8-17).

Similar testimony was presented by Brent Baldwin, one of the attorneys who represented Dr. Bubenik in the *Johnston* litigation.[7] Mr. Baldwin testified that any juror with a basic understanding of the Fifth Amendment would conclude that the defendant asserting the privilege is trying to hide something, and this makes the case virtually "unwinnable." (Trial Tr. Vol.II P.21 L.15-24). To clarify, he noted that jurors sometimes attempt to punish a defendant civilly when they feel that the defendant is attempting to escape criminal liability by invoking the Fifth Amendment privilege. (Trial Tr. Vol.II P.25 L.4-P.26 L.11). Mr. Baldwin also identified several issues presented in the *Johnston* case to which Dr. Bubenik's testimony would have contributed significantly. He discussed how the defense could benefit from testimony by Dr. Bubenik about his personal background, including the fact that he has children with special needs and that he has had a lot of experience with this type of sedation and procedure. (Trial Tr. Vol.II P.30 L.16-P.32 L.24). Dr. Bubenik also could have explained whether he attempted to perform CPR and the defense could have used the information that Dr. Bubenik supplied to the Missouri Dental Board. (Trial Tr. Vol.II P.38 L.22-P.39 L.3, 17-22) (Pl. Ex.55). This information that Dr. Bubenik could have provided was not available in the medical records or elsewhere and he was the only person

---

[7]In their Reply Brief, the Johnston Defendants allege that, in his defense of Dr. Bubenik, Mr. Baldwin did not intend to defend on liability, rather, he intended to defend primarily on the issue of damages. While it is true that Mr. Baldwin's Attorney Suit Report reflects this strategy, the Johnston Defendants fail to take into account that the Report was drafted with full knowledge that Dr. Bubenik had asserted his Fifth Amendment rights and was refusing to testify. (Def. Ex. B, p. 6). It is possible, if not likely, that the strategy would have changed to include a defense on liability if Dr. Bubenik were fully cooperating and his testimony were fully available to use as evidence.

who could testify to it. (Trial Tr. Vol.II P.40 L.7-P.41 L.11). Further, without Dr. Bubenik's testimony to distinguish the two cases, Mr. Baldwin opined that it would be difficult, if not impossible, to keep the *Jaudon* case out of evidence. (Trial Tr. Vol.II P.26 L.23-P.27 L.4). Finally, because Dr. Bubenik was not testifying, Mr. Baldwin did not have the option of using the defendant as an expert witness, a strategy he has used in the past. (Trial Tr. Vol.II P.32 L.14-24).

Dr. Bubenik's assertion of the Fifth Amendment didn't just impact his own ability to testify; rather, it impacted the ability of others to testify in his defense. Specifically, both Mr. Bean and Mr. Baldwin testified that Dr. Bubenik's assertion of the Fifth Amendment negatively impacted the availability and effectiveness of possible expert testimony. Mr. Baldwin explained that without Dr. Bubenik's explanations, a potential expert witness could only consider the record in forming his or her opinion, without the benefit of further explanation or clarification from the doctor. (Trial Tr. Vol.II P.19 L.9-24). If information from the defendant were to be used and Dr. Bubenik continued to take the Fifth Amendment, there can be negative consequences, as Mr. Bean pointed out. He testified that as a result of Dr. Bubenik's assertion of the Fifth Amendment privilege, the defense in the *Jaudon* case could not use any of the information Dr. Bubenik had provided to them, and their expert, who had received some information from the doctor, was stricken completely. (Trial Tr. Vol.I P.178 L.3-P.179 L.5). This leaves the insurance company, or whomever is conducting the defense, in the predicament of choosing between giving their expert access only to very limited information or risking the ability of that expert to actually testify at trial. Choosing between an expert rendered ineffective from lack of information and no expert at all isn't much of a choice. In a case that relies heavily on expert testimony, as medical malpractice cases do, this leaves the defense in a perilous position. Even Kevin O'Malley, the Defendants'

highly competent expert witness, noted the importance of utilizing an expert witness in a medical malpractice case. He testified that he has never gone to trial in a medical malpractice case without one. (Trial Tr. Vol.II P.158 L.2-7).

Defendants make several additional arguments as to why MPC did not suffer substantial prejudice as a result of Dr. Bubenik's assertion of the Fifth Amendment. First, both sets of Defendants, in their Post-Trial Briefs and Reply Briefs, offer statements such as "even if the Fifth Amendment had not been asserted, the defense was hopeless" and "Plaintiff suffered no substantial prejudice because the case was, in fact, indefensible" as rationale for their argument that there was no prejudice to MPC. However, these statements indirectly misstate the substantial prejudice standard in that they imply that MPC must prove that it would have been able to successfully defend and win the case, had Dr. Bubenik cooperated. This is not the standard MPC is required to meet. Instead, the standard is much lower, requiring only that MPC demonstrate that Dr. Bubenik's testimony and information would have been important in the defense of the case. *Hendrix v. Jones*, 580 S.W.2d 740, 743 (Mo. 1979) (en banc).

Defendants also argue that the *Johnston* case could have been settled at mediation for a smaller sum, but MPC rejected the opportunity and, thus, MPC cannot now claim substantial prejudice. The problem with this argument is that the testimony presented at trial is inconsistent and equivocal. It is not clear that either a $600,000.00 settlement offer or a $500,000.00 settlement offer was even made, irrespective of whether MPC was willing to pay that sum of money. (Trial Tr. Vol.II P.60 L.19-P.64 L.4; P.115 L.19-P.119 L.3). Further, whether the case might have been settled is irrelevant to the determination of whether MPC was prejudiced by Dr. Bubenik's refusal to cooperate. The Defendants again are placing too much emphasis on the

ultimate outcome of the case instead of focusing on how Dr. Bubenik could have assisted in the defense. Whether the case settled very early or went all the way to trial, Dr. Bubenik's assertion of the Fifth Amendment hampered MPC's ability to provide him a defense.

It is clear by a preponderance of the evidence that based on the facts of this case, Dr. Bubenik's failure to cooperate in accordance with the terms of his insurance policy caused MPC substantial prejudice. Dr. Bubenik's testimony was highly important to the defense of the medical malpractice case that was brought against him and, thus, his failure to testify is enough to establish substantial prejudice. Even further, however, Dr. Bubenik's assertion of the Fifth Amendment negatively impacted the ability of the defense to utilize expert witnesses, who are crucial in medical malpractice cases.

## D.    REASONABLE DILIGENCE

In addition to proving substantial prejudice, an insurer invoking the protection of a cooperation clause must "present evidence of [non-cooperation] by showing what steps it took in order to locate the insured and to secure his cooperation in defending the action." *Colson v. Lloyd's of London*, 435 S.W.2d 42, 45 (Mo. Ct. App. 1968). As evidenced by the minimal briefing by the parties on this issue, the reasonable diligence requirement, as applied in this case, is of relatively little importance. It is a requirement, however, and must be addressed by the Court.

Here, the insured was not absent from trial or trial preparation, as is the case in many cooperation clause cases. Rather, Dr. Bubenik was present but asserted his Fifth Amendment rights and refused to testify or to otherwise contribute to the defense. Thus, locating the insured was not an issue in this case and the Court will focus on whether the insurer effectively attempted to secure the insured's cooperation.

At trial, a significant amount of evidence was presented to the Court demonstrating that MPC made numerous attempts to secure the cooperation of Dr. Bubenik. Ranging from letters to personal conversations to attempts to ask questions upon submission of interrogatories and at a deposition, MPC put forth more than enough effort to attempt to convince Dr. Bubenik to cooperate. Dr. Bubenik consistently asserted the Fifth Amendment and refused to cooperate. As this Court has previously noted, MPC was not required to harass him into testifying. Thus, MPC demonstrated that it exercised reasonable diligence in attempting to obtain Dr. Bubenik's cooperation.

In their post-trial briefs, Defendants again raise the affirmative defenses of waiver and estoppel, issues that this Court dealt with when it denied Defendants' Joint Motion for Summary Judgment. The gist of Defendants' argument is that MPC provided the Bubenik Defendants with a defense in his medical malpractice case for almost a year, knowing that Dr. Bubenik would assert the Fifth Amendment, until MPC finally issued a reservation of rights letter. Defendants argue that because MPC waited so long, the insurance company is now either estopped from arguing or has waived its argument that the Bubenik Defendants breached the cooperation clause.

In an Order dated February 12, 2008, this Court held that Defendants presented insufficient evidence to support a finding in their favor on the issues of waiver and estoppel.[8] The only new evidence Defendants presented to the Court with respect to this issue was the testimony

---

[8]With respect to estoppel, the Court reasoned that MPC's continued defense of the Bubenik Defendants, after Dr. Bubenik asserted the Fifth Amendment, was not an inconsistent act or statement and that Defendants cannot rely on MPC's actions in the *Jaudon* case to establish prejudice, as each case defended is different and raises different legal issues. With respect to waiver, the Court noted that there is no evidence that MPC intended to voluntarily relinquish its right to rely on the cooperation clause. *Med. Protective Co. v. Bubenik*, 2008 WL 382384, at *7-*8 (E.D. Mo. 2008).

of Mr. O'Malley. He testified that it was his expert opinion that the issuance of the reservation of rights letter was untimely, because it was clear that Dr. Bubenik was going to assert his Fifth Amendment privilege after the *Jaudon* case. While this testimony is persuasive, the Court still believes that neither waiver nor estoppel applies. That the doctor asserted the Fifth Amendment throughout the *Jaudon* case did not definitively establish that he would do it again in the *Johnston* case. Further, Defendants cannot demonstrate that MPC intended to voluntarily waive its right to deny coverage for breach of the cooperation clause. MPC's conduct is altogether consistent with the stated belief of its witnesses that Dr. Bubenik would change his mind and testify in his defense in the *Johnston* case. MPC cannot be criticized for waiting, in holding coverage open for Dr. Bubenik. To the contrary, pulling the coverage early would arm Dr. Bubenik with the argument that he was not given a fair chance to assess his options, since no criminal prosecution had been initiated and the criminal prosecution might be a lesser consideration in light of the serious consequences to Dr. Bubenik in losing insurance coverage. Thus, the Court adopts the reasoning it set forth in its February 12, 2008 Order, and holds that Defendants' affirmative defenses are inapplicable to the case at hand.

## E.    JOHNSTON DEFENDANTS' MINIMUM LIABILITY COVERAGE ARGUMENT

In their Post-Trial Brief, the Johnston Defendants ask this Court to determine that the cooperation clause at issue is unenforceable, based on the reasoning set forth in *Cashon v. Allstate Insurance Co.*, a Missouri case involving the Motor Vehicle Financial Responsibility Law. In *Cashon*, the Missouri Court of Appeals held that the cooperation and notification clauses of the insurance policy at issue were unenforceable because they denied coverage that was within

the minimum liability coverage required by the Motor Vehicle Financial Responsibility Law.[9]  190

S.W.3d 573, 575-77 (Mo. Ct. App. 2006).  The Johnston Defendants argue that the Bubenik

Defendants are required to carry a minimum level of malpractice insurance under Mo. Rev. Stat. §

383.500, and enforcing the cooperation clause in this case would deny coverage within this

minimum level of required insurance.  Thus, they argue that the cooperation clause should not be

enforced.

Although the Johnston Defendants' argument is a novel one, the Court cannot adopt the

*Cashon* reasoning to invalidate the cooperation clause at issue in this case.  It is clear that the

Motor Vehicle Financial Responsibility Law was enacted "to ensure that persons injured on

Missouri highways may collect at least minimal damage awards against negligent motor vehicle

operators."  *Cashon*, 190 S.W.3d at 576 (citing *Halpin v. Am. Family Mut. Ins. Co.*, 823 S.W.2d

479, 482 (Mo. 1992) (en banc)).  The medical malpractice insurance law, on the other hand,

appears to have been enacted for an entirely different purpose.  Medical malpractice coverage is

only required for those doctors who are on the medical staff of a hospital in a county with a

population greater than 75,000.  This suggests that the legislature intended to protect the

hospitals that employ the physicians, rather than the patients they treat.  Requiring doctors who

work at hospitals to maintain malpractice insurance makes it less likely that those hospitals will be

---

[9]The Motor Vehicle Financial Responsibility Law, Mo. Rev. Stat. § 303.190, establishes "that motor vehicle owners must maintain financial responsibility for their vehicles," which is typically done by purchasing an insurance policy.  *Cashon v. Allstate Ins. Co.*, 190 S.W.3d 573, 575-76 (Mo. Ct. App. 2006).  The Law specifically provides "that a motor vehicle liability policy must have limits no lower than twenty-five thousand dollars for bodily injury or death of one person and fifty thousand dollars because of bodily injury or death of two or more persons."  *Id.* at 576.

forced to pay for the negligent acts of their doctors and, ultimately, makes it less costly to hire additional doctors.[10]

In *Cashon*, the court refused to enforce a cooperation clause that would make recovery unlikely for a motorist injured by an uninsured driver, the class of people the Motor Vehicle Financial Responsibility Law was designed to protect. In the present case, the injured party (the patient and his family) is not the class of people that the medical malpractice insurance law was designed to protect. In fact, the class that Mo. Rev. Stat. § 383.500 was designed to protect is not even a party to this litigation. The argument that an insurer should not be able to deny coverage within the minimum required, while persuasive in the motor vehicle insurance context, is not persuasive in the medical malpractice insurance context.

## III.    CONCLUSION

Dr. Bubenik, because of his actions, placed himself in a position in which he had to make difficult choices. MPC repeatedly tried to persuade Dr. Bubenik to cooperate in the defense of the *Johnston* case, and his refusal to do so should not require MPC to suffer the consequences that result from Dr. Bubenik's reliance on his Fifth Amendment rights under the United States Constiution.

MPC has met its burden. It has shown that the cooperation clause is enforceable and that Dr. Bubenik materially breached that clause. It has demonstrated that it suffered substantial

---

[10]James G. Wiehl authored an article in which he argued that "[t]heories expanding a hospital's liability for the actions of physicians on its staff are becoming a major concern that hospitals must protect against, adding to the cost of granting privileges." He noted that Missouri passed Mo. Rev. Stat. § 383.500 in response to this dilemma. James G. Wiehl, *"Physician Integration": The Legal Pressures for Consolidation of Health Care Services*, 34 St. Louis U. L.J. 917, 921 (1990).

prejudice as a result of Dr. Bubenik's conscious decision to assert his Fifth Amendment rights. Finally, MPC has shown that it sought Dr. Bubenik's cooperation with reasonable diligence. Thus, the Court finds that Dr. Bubenik breached the cooperation clause in the insurance agreement he had with MPC and, as a result, MPC is not required to provide the Bubenik Defendants with insurance coverage.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's requested declaratory judgment relief is **GRANTED**.

An appropriate Order of Judgment shall accompany this Order.

Dated this <u>21st</u> Day of <u>November</u>, 2008.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE